Argued and submitted January 12, 2005, decision of Court of Appeals and judgment of circuit court affirmed January 12, 2006

MICHAEL WAYNE MILLER,
*Petitioner on Review,*

*v.*

Robert LAMPERT,
Superintendent,
Snake River Correctional Institution,
*Respondent on Review.*

(CC 0007403M; CA A120055; SC S51716)

125 P3d 1260

Rankin Johnson IV, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Thomas J. Hester and Steven T. Wax, Portland, filed the brief for *amici curiae* OCDLA and Federal Defender.

KISTLER, J.

## KISTLER, J.

Petitioner raises two issues in this post-conviction proceeding. The first is whether *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), applies retroactively. Petitioner acknowledges that this court has held that it does not, *see Page v. Palmateer*, 336 Or 379, 84 P3d 133 (2004) (so holding), but he argues that later cases have undermined *Page*'s reasoning. If *Apprendi* does not apply retroactively, the second issue is whether petitioner's trial counsel was constitutionally inadequate for failing to anticipate and argue for the federal rights that *Apprendi* later recognized.

In January 1998, petitioner entered a high school, grabbed a 16-year-old girl by the arm, reached up her skirt, and touched her vagina. The victim broke away, and petitioner again grabbed her and reached up her skirt. After the victim broke away a second time, petitioner blocked the door to prevent her from escaping. The state charged petitioner with one count of first-degree unlawful sexual penetration, ORS 163.411; one count of first-degree sex abuse, ORS 163.427; two counts of first-degree burglary, ORS 164.225; and one count of attempted first-degree rape, ORS 163.375. A jury convicted petitioner of all the charges except first-degree unlawful sexual penetration.

The trial court held a sentencing hearing on August 12, 1998. At that hearing, the state argued that the court should sentence petitioner as a dangerous offender because, among other things, he had committed a Class A felony and was suffering "from a severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." *See* ORS 161.725(1) (stating criteria for dangerous offender sentence).[1] If imposed, a dangerous

---

[1] ORS 161.725(1) provides, in part:

"[T]he maximum term of an indeterminate sentence of imprisonment for a dangerous offender is 30 years, if the court finds that because of the dangerousness of the defendant an extended period of confined correctional treatment or custody is required for the protection of the public and if it further finds * * * that one or more of the following grounds exist:

"(a) The defendant is being sentenced for a Class A felony, and the court finds that the defendant is suffering from a severe personality disorder

offender sentence would exceed the maximum sentence that the trial court otherwise could have imposed on petitioner. *See* ORS 161.725(1) (authorizing maximum indeterminate sentence of 30 years for dangerous offenders); ORS 161.737(1) and (2) (authorizing maximum determinate sentence equal to twice presumptive sentence for dangerous offenders).

In arguing that the court should sentence petitioner as a dangerous offender, the state relied primarily on the presentence investigation (PSI) report. The PSI revealed that petitioner had 10 prior convictions, including a robbery conviction, four prior convictions for exposing himself to women, and a conviction for battery in which, similarly to this case, he had grabbed a woman while exposing himself. The state also relied on a psychological evaluation, which concluded that petitioner is "a seriously character-disordered individual who is not amendable to community-based sex offender treatment and who poses a substantial threat to the safety and welfare of the community relative to commission of further sex crimes."

At the sentencing hearing, petitioner did not challenge the trial court's authority to sentence him as a dangerous offender, he did not contest the accuracy of his criminal history set out in the PSI, and he did not seek to cross-examine the psychologist on whose report the state relied. Defense counsel explained that he had been present during the psychological examination, that he had reviewed the psychologist's report, and that he did not "think there's much to be gained by having him present today." The only evidence that defense counsel offered at the sentencing hearing was an unsworn statement from a person who had worked with petitioner at Good Samaritan Ministries. She stated that, in her opinion, "if [petitioner] were to have a focused, intensive, concise program, he could be rehabilitated."[2]

---

indicating a propensity toward crimes that seriously endanger the life or safety of another."

[2] It is unclear whether the witness was a licensed counselor, some other person qualified to offer an opinion on petitioner's amenability to treatment, or a layperson.

Defense counsel acknowledged that the trial court could sentence petitioner as a dangerous offender but asked the court to impose a 75-month rather than a 30-year sentence. He told the court: "Clearly, based on [petitioner's] history, if you want to apply that statute, you can do it, but I ask if you consider doing that to use the 75 months as the base sentence." Counsel argued that a 75-month sentence both would give petitioner sufficient incentive to take advantage of various programs and also would be adequate to protect society.

Relying on the PSI and the psychological evaluation that the state had submitted, the trial court found that petitioner was a dangerous offender. The court reasoned:

> "[Petitioner's] situation is one where I think the [c]ourt would be, quite frankly, really not living up to its obligation as one of the linchpins of an ordered society to say anything other than that he certainly fits the criteria for dangerous offender sentencing. You just have to take [the psychological] reports and evaluations and just drop them in the dust bin to say otherwise."

Pursuant to the dangerous offender statute, the trial court imposed, on petitioner's two burglary convictions, concurrent 96-month determinate sentences and concurrent 30-year indeterminate sentences. The court imposed guidelines sentences on petitioner's other convictions and ruled that those sentences would run concurrently with the dangerous offender sentences. Petitioner did not appeal from the resulting judgment.

Almost two years after petitioner's conviction became final, the United States Supreme Court issued its decision in *Apprendi*. Relying on the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 US at 490.

Shortly after the Court issued its decision in *Apprendi*, petitioner filed a petition for post-conviction relief. Relying on *Apprendi*, he alleged that the trial court had imposed his sentence in violation of the Sixth Amendment

and the Due Process Clause because a jury had not found beyond a reasonable doubt that he was a dangerous offender. Alternatively, he alleged that his trial counsel had been constitutionally inadequate for failing to assert that he had a right under the federal constitution to have a jury make the requisite factual findings beyond a reasonable doubt. The post-conviction court denied both claims for relief.

Petitioner appealed, renewing the arguments that he had made to the post-conviction court. While petitioner's case was on appeal, this court issued its decision in *Page v. Palmateer*, holding that *Apprendi* does not apply retroactively to judgments that became final before the decision in *Apprendi* issued. The Court of Appeals affirmed the post-conviction court's judgment from the bench, presumably relying on this court's decision in *Page* and its own decision in *Teague v. Palmateer*, 184 Or App 577, 591-92, 57 P3d 176 (2002), *rev den*, 335 Or 181 (2003), holding that trial counsel had not been inadequate in failing to foresee *Apprendi*.

We allowed review primarily to consider petitioner's argument that our decision in *Page* is no longer good law in light of later developments in federal law. In analyzing that issue, we begin with a discussion of our decision in *Page* and a later United States Supreme Court decision addressing whether *Apprendi* applies retroactively. We then turn to petitioner's arguments and explain why they do not persuade us that we should retreat from our holding in *Page*.

Procedurally, the facts in *Page* are identical to the facts here. In *Page*, as in this case, the trial court sentenced the petitioner as a dangerous offender pursuant to ORS 161.725(1) and imposed a 30-year indeterminate sentence. 336 Or at 381-82. The petitioner's conviction in *Page* became final in 1998, as did petitioner's conviction. *Id.* at 382; *see Caspari v. Bohlen*, 510 US 383, 390, 114 S Ct 948, 127 L Ed 2d 236 (1994) (defining when convictions become final for purposes of retroactivity analysis). Approximately two years later, the Court issued its decision in *Apprendi*, and the petitioner in *Page* filed a petition for post-conviction relief, arguing that the trial court had imposed his sentence in violation of *Apprendi*. *Id.*

As in this case, the petitioner in *Page* did not dispute that *Apprendi* had announced a new rule or that his conviction became final before the Court issued its decision in *Apprendi*. The only question before the court in *Page* was whether *Apprendi* applied retroactively. *Page*, 336 Or at 383. On that issue, this court explained that federal retroactivity principles govern whether a new federal rule applies retroactively in state court. *Id.* at 385-87.

Following the principles announced in *Teague v. Lane*, 489 US 288, 109 S Ct 1060, 103 L Ed 2d 334 (1989) (plurality), this court explained that, with two exceptions, a new federal constitutional rule does not apply retroactively. *Page*, 336 Or at 388. The petitioner in *Page* did not argue that the first exception that *Teague* recognized—for rules that "place[ ] certain kinds of primary, private individual conduct beyond the power of criminal law-making authority"— applied. *See Teague*, 489 US at 307 (describing first exception). He argued, however, that the second *Teague* exception—for rules that "requir[e] the observance of those procedures that * * * are implicit in the concept of ordered liberty"—did apply. *See id.* (describing second exception). It followed, he concluded, that *Apprendi* applied retroactively.

This court reached a different conclusion. It observed that the second *Teague* exception applies only to " 'watershed rules' " of criminal procedure, " 'without which the likelihood of an accurate conviction is seriously diminished.' " *Page*, 336 Or at 389 (quoting *Teague*, 489 US at 311, 313). The court reasoned that the rule announced in *Apprendi*—requiring any fact that increases a defendant's *sentence* beyond the statutory maximum, other than the fact of a prior conviction, be proved to a jury beyond a reasonable doubt—is not a "watershed" rule because "[t]he rule [in *Apprendi*], by its terms, is not concerned with ensuring the accuracy of a criminal defendant's *conviction*." *Id.* at 390 (emphasis added). It followed, under *Teague*, that *Apprendi* did not apply retroactively. *Id.*

After this court's decision in *Page*, the United States Supreme Court held in *Schriro v. Summerlin*, 542 US 348, 124 S Ct 2519, 159 L Ed 2d 442 (2004), that the jury-right aspect of *Apprendi*—requiring that a jury find each fact

increasing a criminal defendant's sentence beyond the statutory maximum—is not a watershed rule of criminal procedure that applies retroactively. The Court explained that "we cannot confidently say that judicial factfinding *seriously* diminishes accuracy." *Id.* at 356 (emphasis in original). The Court was careful to note, however, that the reasonable doubt aspect of *Apprendi*—requiring that each fact increasing a criminal defendant's sentence beyond the statutory maximum be proved beyond a reasonable doubt—was not at issue in that case. *Id.* at 351 n 1.

On review in this case, petitioner points out that the reasoning in *Schriro* does not apply to the reasonable doubt aspect of *Apprendi*, and he argues that the cases decided since *Apprendi* demonstrate that the reasoning in *Page* is unsound. With regard to *Schriro*, petitioner reasons that, although judicial factfinding may not "seriously diminish" the accuracy of a criminal proceeding, as the Court held in *Schriro*, the failure to apply a reasonable doubt standard does. Noting that the Court has described the reasonable doubt standard as "a prime instrument for reducing the risk of convictions resting on factual error," *In re Winship*, 397 US 358, 363, 90 S Ct 1068, 25 L Ed 2d 368 (1970), petitioner contends that this court should recognize that the reasonable doubt aspect of *Apprendi* is a "watershed" rule of criminal procedure that applies retroactively.

With regard to *Page*, petitioner argues that this court's distinction between new rules that affect a defendant's conviction and new rules that affect a defendant's sentence is not good law in light of *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004). *Blakely* made clear, petitioner contends, that any fact that enhances a defendant's sentence—whether it is a necessary prerequisite to a finding of guilt or a sentencing factor—is an element of the crime for the purposes of the Sixth Amendment right to a jury trial and the due process right to proof beyond a reasonable doubt.

■　　Petitioner's argument that the reasonable doubt aspect of *Apprendi* is a watershed rule is difficult to square with the retroactivity analysis in *Teague* and the Court's consistent application of that analysis. As noted, a plurality of

the Court reasoned in *Teague* that, with two narrow exceptions, new federal constitutional rules do not apply retroactively. 489 US at 310. Petitioner does not rely on the first *Teague* exception; he bases his argument instead on the second exception. The plurality in *Teague* explained, however, that the second exception includes only those watershed rules of criminal procedure that " 'alter our understanding of the *bedrock procedural elements*' " essential to the fairness of a proceeding. *Id.* at 311 (quoting *Mackey v. United States*, 401 US 667, 693-94, 91 S Ct 1160, 28 L Ed 2d 404 (1971)) (emphasis in original). The plurality observed that, for a new rule of procedure to fall within this exception, it must be a rule that is both an "absolute prerequisite to fundamental fairness" and one "without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 313-14.

The plurality envisioned that few rules would meet those criteria, stating:

"Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge."

*Id.* at 313. Since *Teague*, the Court has not identified any new rule that would qualify as a watershed rule under the second exception, and it has pointed "only" to the right to counsel recognized in *Gideon v. Wainwright*, 372 US 335, 83 S Ct 792, 9 L Ed 2d 799 (1963), as the kind of rule that would qualify. *See Beard v. Banks*, 542 US 406, 417-18, 124 S Ct 2504, 159 L Ed 2d 494 (2004) (describing second *Teague* exception). The rule in *Gideon* would qualify as a watershed rule, the Court explained, because that decision "alter[ed] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Id.* at 418 (emphasis in original; internal quotation marks omitted). To date, no other rule has had "the primacy and centrality of the rule adopted in *Gideon*." *Id.* at 420.

Consistently with that view of the second *Teague* exception, the Court has explained that the fact that a new rule advances the "accuracy and fairness of capital sentencing judgments" is not enough to make it a watershed rule. *Sawyer v. Smith*, 497 US 227, 242, 110 S Ct 2822, 111 L Ed

2d 193 (1990). "More is required. A rule that qualifies under [the second] exception must not only improve accuracy, but also must alter our understanding of the *bedrock procedural elements* essential to the fairness of the proceeding." *Id.* (emphasis in original; internal quotation marks omitted).

The Court accordingly held in *Sawyer* that a new constitutional rule preventing prosecutors from diminishing a jury's sense of responsibility for imposing the death penalty did not apply retroactively. The Court reasoned that a capital defendant always could have claimed that the prosecutor's remarks rendered the proceeding fundamentally unfair. *See id.* at 243-44 (citing *Donnelly v. DeChristoforo*, 416 US 637, 94 S Ct 1868, 40 L Ed 2d 431 (1974)). It followed, the Court concluded, that the new rule enhanced the fairness and accuracy of capital sentencing only incrementally—a change that was not sufficient to make it a watershed rule. *Id.* at 244.

Similarly, in *Beard*, the question was whether a new rule that states may not require juries in death-penalty cases to find mitigating circumstances unanimously came within the second *Teague* exception. *See* 542 US at 408, 419-20 (stating question). The Court recognized that the new rule increased the likelihood that juries would be able to consider capital defendants' mitigating evidence fully and thus avoided situations that the Court previously had described as the "height of arbitrariness." *Id.* at 419 (internal quotation marks omitted). The Court explained, however, that "the fact that a new rule removes some remote possibility of arbitrary infliction of the death sentence does not suffice to bring it within *Teague*'s second exception." *Id.* at 419-20.

■ With that background in mind, we turn to the question whether the reasonable doubt aspect of *Apprendi* constitutes a watershed rule within the meaning of *Teague*. We begin by recognizing that, as petitioner argues, applying a reasonable doubt standard to sentencing factors decreases the risk of an erroneous enhanced sentence. However, to qualify as a "watershed" rule of criminal procedure under *Teague*, it is not enough that the rule enhances the accuracy of a criminal proceeding. *Sawyer*, 497 US at 242. The rule "also must alter our understanding of the *bedrock procedural*

*elements* essential to the fairness of the proceeding." *Id.* (emphasis in original; internal quotation marks omitted).

We are not persuaded that *Apprendi*'s application of the reasonable doubt standard meets that test for two reasons. First, we do not believe that the rule announced in *Apprendi* is an "absolute prerequisite to fundamental fairness" because the extent to which the rule plays a role in criminal proceedings is dependent on the sentencing scheme that the legislature devises. As one court has put it, the rule "floats and flows with the tide of legislative pronouncements." *United States v. Moss*, 252 F3d 993, 1000 (8th Cir 2001). The Court's recent decision in *United States v. Booker*, 543 US 220, 125 S Ct 738, 160 L Ed 2d 621 (2005), illustrates the point.

In *Booker*, the Court held that the federal sentencing guidelines were in conflict with the rule announced in *Apprendi* because, if a sentencing court made certain findings, the guidelines required the court to enhance a defendant's sentence beyond that authorized by the jury verdict alone. *See* 125 S Ct at 748-52. After concluding that the guidelines conflicted with *Apprendi*, the Court sought "to determine what Congress would have intended in light of the Court's constitutional holding." *Id.* at 757 (internal quotations omitted). The Court determined that it would deviate less from Congress' intended sentencing scheme by severing the portions of the guidelines that made them mandatory, rendering the guidelines merely advisory. *Id.* at 756-57.

The Court's chosen remedy in *Booker* allows federal sentencing courts to sentence defendants anywhere between the statutory minimum and maximum after taking the factors set out in the guidelines into consideration. *Id.* In doing so, sentencing courts, without running afoul of *Apprendi*, may make any finding by a preponderance of the evidence that they deem appropriate in determining the sentence. The Court explained:

"We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. * * * [W]hen a trial judge exercises his discretion to

select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."

*Id.* at 750.

The Oregon legislature, without running afoul of the rule announced in *Apprendi*, could devise a similar system, creating wide sentencing ranges that it deemed appropriate and allowing sentencing courts to impose sentences within that range after making any findings that it deemed relevant—including whether a defendant is a "dangerous offender." *See Apprendi*, 530 US at 490 n 16 (recognizing that states could devise such a system without running afoul of Sixth or Fourteenth Amendments). In our view, a rule like that in *Apprendi* that is so dependent on legislative choice cannot be considered a "watershed" rule of criminal procedure that is an "absolute prerequisite to fundamental fairness." *See Beard*, 542 US at 418-20 (recognizing that rules that apply only incrementally or situationally do not constitute watershed rules under the second *Teague* exception).

A second consideration supports our conclusion. The Court has held in another context that the failure to submit an element of a criminal offense to a jury can be harmless error because, on the facts of a particular case, the error may not have "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings." *Johnson v. United States*, 520 US 461, 469-70, 117 S Ct 1544, 137 L Ed 2d 718 (1997).[3] In reaching that conclusion, the Court rejected the defendant's argument that the right to have a jury find each element of the charged crime beyond a reasonable doubt was so fundamental to a fair trial that its omission should be considered, like the failure to provide counsel, structural error. *Id.* at 466. Given the Court's rejection of that argument, we cannot say that the new rule that *Apprendi* announced is, like the right to counsel, a bedrock procedural element essential to fundamental fairness. *See Sawyer*, 497 US at 244-45 (looking to Court's treatment of new rule in other contexts to determine whether it came within second *Teague* exception).

---

[3] The Court held in *Johnson* that, because the evidence of materiality was overwhelming, the trial court's failure to submit that element of the crime of perjury to the jury was harmless error. 520 US at 469-70.

■ ■ Having concluded that the rule announced in *Apprendi* does not apply retroactively, we turn to petitioner's alternative claim that his trial counsel was constitutionally inadequate in violation of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. We begin with Article I, section 11. *See Lichau v. Baldwin*, 333 Or 350, 358-59, 39 P3d 851 (2002) (court should consider state constitutional claims before federal constitutional claims). In determining whether petitioner received constitutionally inadequate assistance of counsel under Article I, section 11, we consider two issues:

> " 'First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his lawyer] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial.' "

*Burdge v. Palmateer*, 338 Or 490, 492, 112 P3d 320 (2005) (quoting *Lichau*, 333 Or at 359).

On the first issue, petitioner contends that constitutionally adequate counsel would have foreseen the holding in *Apprendi* and argued, at petitioner's sentencing hearing, that the federal constitution required a jury to find beyond a reasonable doubt that petitioner was a dangerous offender.[4] Petitioner acknowledges that the Court did not decide *Apprendi* until almost two years after his sentencing hearing. He argues, however, that three United States Supreme Court decisions foreshadowed the Court's later holding in *Apprendi*.[5]

---

[4] Petitioner does not contend that his trial counsel was constitutionally inadequate for failing to argue that Article I, section 11, of the Oregon Constitution required a jury to decide whether he was a dangerous offender. *See State v. Wedge*, 293 Or 598, 607, 652 P2d 773 (1982) (requiring jury to decide whether defendant used firearm); *State v. Quinn*, 290 Or 383, 407, 623 P2d 630 (1981) (requiring jury to decide whether defendant acted deliberately). Rather, petitioner bases his inadequate assistance claim solely on his counsel's failure to anticipate the federal rights that *Apprendi* later recognized.

[5] Petitioner relies on a fourth case, *Jones v. United States*, 526 US 227, 119 S Ct 1215, 143 L Ed 2d 311 (1999). The Court, however, did not decide *Jones* until seven months after petitioner's sentencing hearing. We do not consider *Jones* in deciding whether petitioner's counsel should have foreseen the decision in *Apprendi*.

■ This court has explained that, in reviewing whether counsel exercised reasonable professional skill and judgment, it must " 'make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight.' " *Burdge*, 338 Or at 492 (quoting *Lichau*, 333 Or at 360). Accordingly, we look to the decisions that preceded petitioner's sentencing hearing and ask whether, in the exercise of reasonable skill and judgment, petitioner's counsel should have foreseen the Court's decision in *Apprendi*.

Before petitioner's sentencing hearing in August 1998, the Court twice had considered and rejected the argument that a sentencing factor constituted an "element" of the crime, which a jury had to find beyond a reasonable doubt. *See Almendarez-Torres v. United States*, 523 US 224, 118 S Ct 1219, 140 L Ed 2d 350 (1998); *McMillan v. Pennsylvania*, 477 US 79, 106 S Ct 2411, 91 L Ed 2d 67 (1986) (illustrating proposition). The statute at issue in *McMillan* authorized a trial court to impose a mandatory minimum sentence if it found by a preponderance of the evidence that the defendant "visibly possessed a firearm" while committing certain underlying crimes. 477 US at 81. The statute explicitly stated that visible possession of a firearm was not an element of the underlying crime. *Id.* at 83.

Reaffirming its decision in *Patterson v. New York*, 432 US 197, 97 S Ct 2319, 53 L Ed 2d 281 (1977), the *McMillan* Court reasoned that, "[w]hile there are obviously constitutional limits beyond which the States may not go in this regard, the applicability of the reasonable doubt standard * * * has always been dependent on how a State defines the offense that is charged in any given case[.]" 477 US at 85 (internal quotation marks omitted). Under the terms of the statute, "visible possession" was not an element of the crime, which the state had to prove to a jury beyond a reasonable doubt, and the Court rejected the petitioners' arguments that the Sixth Amendment and the Due Process Clause required a different conclusion. *Id.* at 86-91.

In the course of rejecting the petitioners' argument, the Court observed that their argument "would have at least

more superficial appeal if a finding of visible possession exposed them to greater or additional punishment" rather than a mandatory minimum sentence. *Id.* at 88. Although the Court's recognition of that distinction appears to provide some support for petitioner's inadequate assistance claim here, the Court's later decision in *Almendarez-Torres* negated whatever support *McMillan* provided.

In *Almendarez-Torres*, a federal statute authorized sentencing courts to impose two-year sentences on deported aliens who returned illegally to the United States; it also authorized an enhanced sentence of up to 20 years if the court found by a preponderance of the evidence that the returning alien had a prior felony conviction. *See* 523 US at 226 (describing federal statute). Having received an enhanced sentence under that statute, the petitioner in *Almendarez-Torres* argued that, because a prior conviction authorized imposition of a sentence in excess of the statutory maximum rather than a mandatory minimum sentence, the fact of a prior conviction was an "element" of the offense that the government had to prove to a jury beyond a reasonable doubt.

The Court rejected the petitioner's argument. *Id.* at 245. It reasoned that whether a sentencing factor triggers an increased maximum sentence or a mandatory-minimum sentence, which the Court had held constitutional in *McMillan*, is not dispositive because "the risk of unfairness to a particular defendant is no less, and may well be greater, when a mandatory minimum sentence, rather than a permissive maximum sentence, is at issue." *Id.* Thus, the Court declined to "adopt a rule that any significant increase in a statutory maximum sentence would trigger a constitutional 'elements' requirement[,]" reasoning that "such a rule would seem anomalous in light of existing case law[.]" *Id.* at 247.

Although later cases have recast *Almendarez-Torres* as establishing only a "prior conviction" exception to the rule in *Apprendi*, the decision in *Almendarez-Torres*, read on its own terms, stands for a far broader proposition: The Court held in *Almendarez-Torres* that, as a general rule, sentencing factors that enhance the statutory maximum sentence do not

constitute elements of an offense that the state must prove to a jury beyond a reasonable doubt.[6] Indeed, the dissent in *Almendarez-Torres* invited the majority to apply the constitutional rule that the Court later announced in *Apprendi*— an invitation that the Court declined. *See* 523 US at 251 (Scalia, J., dissenting) (urging rule later adopted in *Apprendi*).[7] Far from foreshadowing the rule in *Apprendi*, the Court's decision in *Almendarez-Torres* appeared to reject it.

*Almendarez-Torres* was the controlling United States Supreme Court decision when the trial court imposed a dangerous offender sentence on petitioner. Measured against the law in effect at the time of petitioner's sentencing hearing, the performance of petitioner's trial counsel was constitutionally adequate. Counsel was not required to anticipate that two years later the United States Supreme Court would reverse course in *Apprendi*, interpret the Sixth Amendment and Due Process Clauses as the dissent had urged in *Almendarez-Torres*, and read its decision in *Almendarez-Torres* as establishing only a narrow exception to the new rule announced in *Apprendi*. Petitioner's trial counsel did not fail to exercise reasonable professional skill and judgment. *See Burdge*, 338 Or at 492 (stating standard).

 We turn finally to petitioner's argument that his trial counsel was constitutionally inadequate under the Sixth Amendment. To prevail on that claim, petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). The Court has cautioned that "[a] fair assessment of attorney performance requires that every effort be made to

---

[6] The Court identified a five-factor test that it drew from *McMillan* and earlier cases to identify those few instances in which a sentencing factor would constitute an element of a crime. *See Almendarez-Torres*, 523 US at 242-43 (listing factors).

[7] Justice Scalia explained that, in his view, it was constitutionally impermissible for "a judge (rather than a jury) to determine by a mere preponderance of the evidence (rather than beyond a reasonable doubt) a fact that increases the maximum penalty to which a criminal defendant is subject." *See Almendarez-Torres*, 523 US at 251 (dissenting opinion).

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. For the reasons discussed above, we conclude that trial counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms.

Having considered petitioner's arguments, we hold that *Apprendi* does not apply retroactively and that petitioner's trial counsel's performance did not fall below the minimum standard that Article I, section 11, and the Sixth Amendment require.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.