Argued and submitted September 6, 2013, affirmed January 7, 2015

ASHLEY RACHELLE WADE,
*Petitioner-Respondent,*

*v.*

Kim BROCKAMP,
Superintendent,
Coffee Creek Correctional Facility,
*Defendant-Appellant.*

Washington County Circuit Court
C096022CV; A151622

342 P3d 142

Inge D. Wells, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Lawrence Taylor argued the cause for respondent. On the brief were Erin Galli and Chilton & Galli, LLC.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Egan, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Defendant appeals a judgment vacating petitioner's convictions and granting her a new trial. Defendant assigns error to the post-conviction court's determination that petitioner's criminal trial counsel provided her with constitutionally deficient legal representation by failing to object to a Uniform Criminal Jury Instruction that instructed the jury that a person who aids or abets another in committing a crime is responsible for any other crimes that were a natural and probable consequence of the intended crime. Before petitioner's post-conviction trial but after her criminal trial, the Oregon Supreme Court held in *State v. Lopez-Minjarez*, 350 Or 576, 260 P3d 439 (2011), that the "natural and probable consequences" jury instruction was an incorrect statement of the law. We conclude that the court did not err in granting post-conviction relief based on the failure of petitioner's trial counsel to object to the giving of that instruction. Accordingly, we affirm.

## I. BACKGROUND

At petitioner's criminal trial, the state adduced the following evidence. Petitioner and the victim had known each other for about two months. During that time, the victim sold petitioner drugs and they used drugs together. The victim had a romantic interest in petitioner, which he believed she leveraged to her advantage to obtain "drugs and money." One night, petitioner called the victim to invite him to "a party," which the victim understood only he and petitioner would be attending. In anticipation of the "party," and desiring a romantic encounter with petitioner, the victim obtained a motel room. However, petitioner arrived at the motel room with her boyfriend, Pray, and another woman. Petitioner informed the victim that she "didn't have any money" and asked him if he had any drugs. The victim did not but agreed that he would go and buy some methamphetamine. Before leaving, the victim checked his wallet to see how much money he had and as he did so, noticed petitioner looking at the cash in his wallet, about $445. The victim managed to purchase $50 worth of methamphetamine and returned to the motel room, where the group proceeded to smoke some of it. Petitioner told the victim that she could

sell the remainder of the methamphetamine for a profit and bring back the proceeds to him. Petitioner left the motel room with her friends.

Later, at about 3:00 a.m., petitioner returned to the motel room with Pray and two unidentified women. Petitioner asked the victim if he wanted to "continue partying," and the victim invited her inside. Petitioner asked if her friends could also come inside, and the victim said that would be "fine." Petitioner sat down on the bed and began to rub the victim's feet. One of the unidentified women threw a hammer-like object in Pray's direction, and he picked it up off the floor and went to use the bathroom. Pray came out of the bathroom and then hit the victim in the nose and eye with the object, knocking him unconscious. When the victim regained consciousness, he saw that his phone and his wallet, which had contained about $395, were missing. He discovered that his van was missing as well.

Petitioner and Pray were arrested the following day. The state charged both with two counts of first-degree robbery, ORS 164.415 (robbery involving the use of a dangerous weapon and robbery involving infliction of serious injury), two counts of second-degree robbery, ORS 164.405 (robbery based on representation that a person is armed with a dangerous weapon and robbery aided by another person present), and one count of first-degree assault, ORS 163.185 (causing serious injury with a dangerous weapon). Petitioner appeared with Pray as codefendants in a trial that occurred in 2006. The state prosecuted its case on a theory that Pray was directly liable for the charged offenses—that he personally inflicted the blow to the victim's face—and that petitioner was liable on an aid-and-abet theory because she set up the victim for the robbery and assault.

In its closing argument, the state explained to the jury its theory of the case:

"What really happened is *** this offer [petitioner] made to, quote, unquote, 'party' with [the victim] *was nothing more than a ploy or trick to get him alone and get—put him in a vulnerable position.*

"Now when she first made that call, *she may or may not have had this Robbery and Assault planned in her mind.*

*** *I don't have to prove that she—beyond a reasonable doubt that that was the moment that she cooked up this plan.* It very well could have been that this was the plan set up from the beginning. *It also could have been, and I admit, that [petitioner] simply wanted a meth fix.* ***

"*****

"[The victim]'s all alone in the [motel room], it's 3 o'clock in the morning, he's basically a sitting duck. Later on in the evening they're out, they're cooking this up, they need more money *** because they're using meth continuously. *** And they plan this. *They cook this scheme up, they're going to go over there and relieve [the victim] of his money.*

"It wasn't enough, though, to just go in and *** have [petitioner] say, you know, 'Hey, [victim], how are you doing,' and—and soften him up and then grab his wallet and run out the door. It would've been, you know, potentially doable. *Instead, it turned violent.* ***"

(Emphases added.) Petitioner's trial counsel and the state requested the following jury instruction:

"A person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that were committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime."[1]

At the time, that instruction was Uniform Criminal Jury Instruction 1052. Petitioner's trial counsel did not object to the instruction. The jury found petitioner guilty of all charges against her.[2]

---

[1] The jury was also given the following aiding-and-abetting instructions, which were not contested by petitioner:

"A person who is involved in committing a crime may be charged and convicted of that crime if, with the intent to promote or facilitate the commission of the crime[,] that person aids and abets someone in committing the crime. Under these circumstances, it is not necessary for that person actually to be personally present at the time and place of the commission of the crime.

"A person aids and abets another person in the commission of a crime if the person, one, with the intent to promote or make easier the commission of the crime; two, encourages, procures, advises or assists by act or advice the planning or commission of the crime."

[2] Petitioner successfully moved for a judgment of acquittal on the charge of robbery based on representation that a person is armed with a dangerous weapon.

Petitioner appealed her judgment of conviction. After we affirmed her convictions without opinion, she petitioned for review by the Oregon Supreme Court, which was denied. Petitioner timely filed her petition for post-conviction relief, and her post-conviction trial was held in July 2011. By then, we had decided *State v. Lopez-Minjarez*, 236 Or App 270, 286, 237 P3d 223 (2010), *aff'd in part, rev'd in part on other grounds*, 350 Or 576, 260 P3d 439 (2011), where we concluded that a "natural and probable consequences" instruction that was identical to the one given at petitioner's criminal trial was "not an accurate statement of the law and that it probably created an erroneous impression of the law in the minds of the jurors." By the time the post-conviction court issued its judgment granting post-conviction relief to petitioner, the Supreme Court had likewise concluded that the instruction was "wrong" and "incorrectly states the principles of accomplice liability under Oregon law." *Lopez-Minjarez*, 350 Or at 582. The post-conviction court found that, under Article I, section 11, "reasonably diligent" counsel would have objected to the instruction and that there was a "significant possibility" that petitioner's counsel's failure to do so prejudiced her. The post-conviction court also found that "[t]here was nothing to lose" by objecting to the instruction. The court, however, concluded that petitioner was not prejudiced under the federal constitution because it could not say "that a reasonable trier of fact *probably* would have drawn" a conclusion that she was prejudiced under the standard articulated in *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 674 (1984) (Emphasis in original.) The post-conviction court added, "Such a finding that the error is likely to have affected the outcome is the standard for granting relief under federal law."

In assigning error to the court's grant of post-conviction relief, defendant raises three arguments: (1) it was not objectively unreasonable for petitioner's trial counsel to fail to "anticipate" *Lopez-Minjarez*; (2) the post-conviction court incorrectly stated the law when it found that petitioner had "nothing to lose" by challenging the incorrect instruction; and (3) the post-conviction court applied an incorrect standard when it determined that counsel was inadequate under the state constitution but not the federal constitution.

## II.  DISCUSSION

ORS 138.530(1) provides for post-conviction relief when there has been a "substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void." Article I, section 11, of the Oregon Constitution and the Sixth and the Fourteenth Amendments to the United States Constitution provide a criminal defendant with a constitutional right to counsel. "Under both constitutions, 'the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance.'" *Montez v. Czerniak,* 355 Or 1, 6, 322 P3d 487 (2014) (quoting *State v. Smith,* 339 Or 515, 526, 123 P3d 261 (2005)). "Those constitutional provisions require 'adequate performance by counsel' concerning the 'functions of professional assistance which an accused person relies upon counsel to perform on his behalf.'" *Id.* (quoting *Krummacher v. Gierloff,* 290 Or 867, 872, 627 P2d 458 (1981)). Article I, section 11, is applied and interpreted independently of the United States Supreme Court's interpretation of the Sixth Amendment, but "nevertheless[,] the standards for determining the adequacy of legal counsel under the state constitution are functionally equivalent to those for determining the effectiveness of counsel under the federal constitution." *Montez,* 355 Or at 6-7 (citing *State v. Davis,* 345 Or 551, 579, 201 P3d 185 (2008)).

In evaluating whether a defendant's lawyer has rendered inadequate assistance under the Oregon Constitution, our analysis ordinarily proceeds in two steps:

> "'First, we must determine whether petitioner demonstrated by a preponderance of the evidence that [his lawyer] failed to exercise reasonable professional skill and judgment. Second, if we conclude that petitioner met that burden, we further must determine whether he proved that counsel's failure had a tendency to affect the result of his trial.'"

*Montez,* 355 Or at 7 (quoting *Lichau v. Baldwin,* 333 Or 350, 359, 39 P3d 851 (2002) (internal citations omitted)). Moreover,

"[o]nly general statements can be made about what constitutes the exercise of professional skill and judgment. [*Krummacher*,] 290 Or at 873. Generally, 'counsel must * * * prepare himself on the law to the extent appropriate to the nature and complexity of the case * * *.' *Id.* at 875. Counsel need not, however, 'expend time and energy uselessly or for negligible potential benefit under the circumstances of the case.' *Id.* at 874."

*Burdge v. Palmateer*, 338 Or 490, 493, 112 P3d 320 (2005). We are also mindful that "'a lawyer's conduct [is evaluated] from the lawyer's perspective at the time, without the distorting effects of hindsight.'" *Id.* at 492 (quoting *Lichau*, 333 Or 360). That is, a lawyer's tactical decisions are not to be second-guessed "'unless those decisions reflect an absence or suspension of professional skill and judgment.'" *Id.* (quoting *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001).

Under the Sixth Amendment, "a petitioner must demonstrate that his or her trial counsel's performance 'fell below an objective standard of reasonableness.'" *Montez*, 355 Or at 7 (quoting *Strickland*, 466 US at 688). As to prejudice, a petitioner is required to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

We review post-conviction proceedings for legal error, *Montez*, 355 Or at 8, and are bound by the post-conviction court's factual findings supported by evidence in the record. *Lichau*, 333 Or at 359. "Additionally, '[i]f findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the [post-conviction court's] ultimate conclusion * * *.'" *Id.* (quoting *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)).

A. *Reasonable professional skill and judgment*

Because petitioner's boyfriend, Pray, attacked the victim, the state prosecuted petitioner on an accomplice liability theory that she aided and abetted the robbery and assault of the victim. That theory of accomplice liability is

addressed in ORS 161.150, which provides that "[a] person is guilty of a crime if it is committed by the person's own conduct or by the conduct of another for which the person is criminally liable, or both[,]" and ORS 161.155, which provides, in part:

"A person is criminally liable for the conduct of another person constituting a crime if:

"* * * * *

"(2) With *the intent to promote or facilitate the commission of the crime* the person:

"* * * * *

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"

(Emphasis added.) Thus, for the state to prove that a defendant is guilty of an offense as an aider-or-abettor, the state must prove the elements of the underlying crime and that the defendant had intent to promote or facilitate the crime by providing aid (or attempting or agreeing to provide aid) to another person in committing the crime.

In *Lopez-Minjarez*, the Supreme Court compared the natural and probable consequence instruction to ORS 161.155 and concluded that the instruction misstated the law. 350 Or at 583. The court described the analysis of why the instruction did not correctly state the requirements of ORS 161.155(2) as "straightforward," noting that ORS 161.155(2)(b) requires a specific intent to promote or facilitate the commission of the crime committed by another person. *Id.* at 582. The court observed that the natural and probable consequence instruction went beyond what is required for accomplice liability because, in addition to being responsible for the intended crime, a person

"*also* is criminally responsible for 'any act or other crime' that was the 'natural and probable consequence' of the intended crime. In effect, the instruction tells a jury that, once it finds liability based on an aiding and abetting theory, it can find a defendant guilty of any *other* crimes that the jury finds to be the natural and probable consequence of the crime for which there was accomplice liability. That criminal responsibility attaches under the instruction for

any naturally consequential crime, without regard to whether the defendant acted with the intent that ORS 161.155 requires.

"Put simply, Oregon law does not give rise to criminal liability on such a theory. Accomplice liability is both created by and limited by ORS 161.155."

*Id.* at 583 (emphases in original). Thus, in *Lopez-Minjarez*, the court did not *change* the law concerning aiding and abetting liability; it simply held that the natural and probable consequence instruction did not *comport* with the law.[3]

In light of *Lopez-Minjarez*, the post-conviction court in this case stated that the natural and probable consequence instruction "is not good law," regardless of "whether or not it was widely followed at the time [p]etitioner's case went to trial."[4] The question for the court, however, was whether

---

[3] In *Lopez-Minjarez*, a series of crimes was committed, beginning with burglary and ending with murder. 350 Or at 578. The state's theory was that both the defendant and his father participated in all of the charged crimes, but the defendant denied his direct participation in the assault and murder of the victim. *Id.* at 579-81. On appeal, the defendant challenged the natural and probable consequence instruction that was given to the jury. The Oregon Supreme Court agreed with our conclusion that the instruction misstated the law but concluded that the defendant was not prejudiced by the instruction as it related to his burglary and kidnapping convictions because "the jury could not have found the burglary to have been a natural and probable consequence of an earlier crime that defendant had aided in committing, because there was no earlier crime in the sequence of charged criminal acts" and the defendant conceded direct participation in the kidnapping. *Id.* at 586-87. For the assault conviction, however, the defendant testified that he did not enter the victim's house and, therefore, the court concluded, the jury could have convicted the defendant of assault on a theory of accomplice liability based on the instruction because the father's assault was a natural and probable consequence of the burglary. *Id.* Similarly, there was no direct evidence of the defendant's participation or intent to murder the victim, and the jury could have concluded based on the instruction that the defendant was an accomplice to the murder because the defendant's father's killing of the victim was a natural and probable consequence of the burglary and the kidnapping. *Id.* at 587-91.

[4] The state posits that the post-conviction court found that the instruction was widely used. That is incorrect. Rather, the court assumed *arguendo* that the instruction was widely followed when it concluded that "generally accepted practice" can nevertheless be constitutionally inadequate representation. We are also careful to not place too much weight on the fact that the natural and probable consequences instruction was a Uniform Criminal Jury Instruction. On the importance, or lack of importance, that the instruction was a Uniform Criminal Jury Instruction, the court commented in *Lopez-Minjarez* that

"[t]he fact that the erroneous instruction is part of the Uniform Criminal Jury Instructions, of course, is inconsequential in the analysis. Those uniform instructions are drafted by a committee of members of the Oregon State Bar and are not themselves the law. They instead are a salutary effort on the

"representation that is consistent with generally accepted practice nevertheless [could] be constitutionally inadequate[.]" In answering that such representation could be constitutionally inadequate, the post-conviction court stated that it arrived at its answer by considering that "adequate representation 'requires a lawyer to do those things necessary to diligently and conscientiously advance the defense.'" (Quoting *Krummacher*, 290 Or at 874.) In the court's view, "reasonably necessary research into the issue of accomplice liability" required first a review of ORS 161.155, the statute providing for aiding and abetting liability, which does not state that a person "is liable for 'other' crimes that occur during the commission of 'the' intended crime." Moreover, the court found that a comparison of the accomplice liability statute to the natural and probable consequence instruction would reasonably require further inquiry into relevant case law because petitioner contended that she had been unaware of a planned robbery or assault. That further inquiry, concluded the post-conviction court, would naturally lead to the discovery of *State v. Anlauf*, 164 Or App 672, 995 P2d 547 (2000).

In *Anlauf*, we reviewed the denial of a motion for judgment of acquittal where the defendant had participated with the codefendant in an assault, but the codefendant acted alone by carrying and displaying a knife while the defendant was withdrawing from the assault. 164 Or App at 677. We reversed the defendant's conviction for unlawful use of a weapon because we concluded that

> "[t]here was nothing to link defendant to the knife offense here except his 'mere presence' when it occurred. There simply is no evidence here from which a trier of fact could draw reasonable inferences to support a finding that defendant committed the essential elements of the crime of unlawful use of the knife."

*Id.* at 678-79. In so concluding, we rejected the state's reliance on *dictum* in *State v. Fichter*, 226 Or 526, 531-32, 360 P2d 278 (1961), "that all conspirators, including aiders and

---

part of legal practitioners in Oregon to state the law in a correct way that is helpful to jurors. As this case demonstrates, that effort does not always succeed."

350 Or at 583 n 4.

abettors, who engage in an unlawful enterprise are responsible 'for all acts committed by the others in the execution of the common purpose, if such acts are a natural or probable consequence of the unlawful combination or undertaking.'" *Anlauf*, 164 Or App at 678 (quoting *Fichter*, 226 Or at 531-32). We stated:

> "Leaving aside the other questions that we have noted about the vitality and relevance of *Fichter, see* note 1, we think that the state misreads the *dictum* that it relies on to mean that all acts by any of the conspirators are, *ipso facto,* natural and probable consequences of the unlawful combination or undertaking. Insofar as the state's theory is that guilt, as an aider or abettor under ORS 161.155, can be predicated on a coconspirator's commission of a *separate crime* to which the defendant is in no way tied, except that the crime occurred during the course of the common criminal episode, [Oregon case law is] to the contrary."

*Id.* (emphasis in original). In the referenced footnote, we stated:

> "*State v. Fichter*, 226 Or 526, 360 P2d 278 (1961), on which the state relies, also is not on point. The decisive issue there was whether the jury could permissibly have found that stealing the victims' property, rather than or in addition to simply assaulting them, was part of the *common* purpose of the defendant and his accomplices. *Fichter*'s value as authority must also be considered in light of the fact that it was decided before the adoption of the Criminal Code of 1971 and turns on the antiquated distinction between 'principals in the first and second degree.'"

*Id.* at 675 n 1 (emphasis in original). Thus, in *Anlauf*—an accomplice liability case that lacked evidence connecting the defendant to the codefendant's use of a weapon—we characterized the case law as not supporting liability for the natural and probable consequences of separate acts committed by accomplices and also noted that any such theory was based on principles of accomplice liability that predated the adoption of the Criminal Code of 1971 and specifically, ORS 161.155.[5]

---

[5] In *Hale v. Belleque*, 255 Or App 653, 686, 298 P3d 596 (2013), we rejected the petitioner's assertion that *Lopez-Minjarez* required reversal of his convictions. Unlike this case, the underlying criminal trial in *Hale* was decided before *Anlauf*, and the record and any concomitant factual findings in that case did not

Defendant plays down the relevance of *Anlauf* as a signal that the uniform jury instruction misstated the law because that case involved the sufficiency of the evidence, not the jury instruction. In petitioner's post-conviction trial, however, she presented as evidence an affidavit and memorandum by Ryan Scott, an experienced Oregon criminal defense trial attorney. In Scott's view, petitioner's counsel's failure to object to the jury instruction fell below the reasonable standard of legal representation of a client charged on an aid-and-abet theory of liability. His reasons included the relevance of *Anlauf*, which "was too important and significant a decision to have gone unread by any attorney representing a person charged as an accomplice." And, according to Scott, the "holding should have alerted any attorney to problems with the natural and probable consequences rule[.]" Moreover, two weeks before petitioner's criminal trial, Scott had initiated a discussion about the instruction on the "listserve" for the Oregon Criminal Defense Lawyer's Association, and had opined that "the *Anlauf* holding is absolutely nonsensical" if the natural and probable consequence instruction was the correct law and that, "based on the comments [Scott had] received, most judges have agreed." In his affidavit, Scott posited that that statement was evidence that, at the time of petitioner's trial, criminal defense attorneys were "routinely objecting" to the instruction and that "they were mostly successful in those objections."

With *Anlauf* and that evidence in mind, we are not persuaded by defendant's contention that the "post-conviction court erred in concluding that trial counsel was inadequate for failing to anticipate" *Lopez-Minjarez*. Defendant cites *Miller v. Lampert*, 340 Or 1, 14-16, 125 P3d 1260 (2006), in support of that contention; in that post-conviction relief case, the petitioner was sentenced as a dangerous offender based on factors considered by the trial court judge. After sentencing, the United States Supreme Court decided *Apprendi v. New Jersey*, 530 US 466, 490, 120 S Ct 2348, 147 L Ed 2d 435 (2000), in which the Court held that any

---

provide a basis for reversal of the post-conviction court's conclusion that trial counsel's performance was reasonably adequate. We also concluded that, assuming *arguendo* that trial counsel erred by not giving the instruction, the error was not prejudicial to the petitioner because the evidence showed that the petitioner was "the primary actor." *Id.* at 687. That is not the case here.

fact other than a prior conviction that is used to increase the penalty for a crime beyond the maximum "must be submitted to a jury, and proved beyond a reasonable doubt." In *Miller*, the court concluded that it was not unreasonable for the petitioner's counsel to fail to anticipate that the Court would "reverse course" two years after a prior decision. 340 Or at 16. However, *Miller* can readily be distinguished from the circumstances of this case. In *Lopez-Minjarez*, the court did not "reverse course," but instead concluded that the natural and probable consequence instruction was inconsistent with the statutory language of ORS 161.155(2). Indeed, in reaching its holding, the court did not have to confront *any* appellate decision that had held that the natural and probable consequence instruction was good law.

We also find unavailing defendant's argument that the post-conviction court erred when it "found that trial counsel should have objected to the 'natural and probable consequences' instruction because '[t]here was nothing to lose by doing so'" and that the finding is "not the correct standard to apply when assessing counsel's adequacy." The post-conviction court reasoned that,

> "[a]rmed with the statutory language and *Anlauf*, reasonably diligent counsel would have objected to the instruction. *There was nothing to lose by doing so.* It is likely that the trial judge would have read the instruction over such an objection. Just as in *Lopez-Minjarez*, however, the basis for a successful appeal would have been laid by such an objection."

(Emphasis added.) To begin, defendant's characterization of the court's finding is incorrect. The post-conviction court found that reasonable counsel would have objected to the natural and probable consequence instruction because of *Anlauf* and the instruction's discordance with the statutory language. In the context of the post-conviction court's findings, we agree with petitioner that the "nothing to lose" language refers to a consideration of whether the failure to raise an objection was tactical in nature. That is, in some cases, defense counsel will take a course of action that is strategic or tactical in nature, and that course of action can be a reasonable exercise of professional skill: "[T]he strategy,

tactics, and manner of advocacy of the defense are for counsel to determine based upon the exercise of professional skill and judgment." *Krummacher*, 290 Or at 875. "Adequacy of assistance of counsel * * * allows for tactical choices that backfire, because, by their nature, trials often involve risk." *Id.*

Thus, when determining whether counsel's performance was constitutionally inadequate, a post-conviction court may consider tactical choices and the risks involved with those choices. Here, the post-conviction court made a finding, in light of that consideration, that objecting to the instruction was risk-free and was, therefore, not a tactical choice with the potential to backfire. *See Pachl v. Zenon*, 145 Or App 350, 369, 929 P2d 1088 (1996), *rev den*, 325 Or 621 (1997) ("[T]here was no plausible reason for failing to object. There was no 'downside' to objecting, and there was nothing to gain from failing to object."). Indeed, the post-conviction court surmised that it was likely that the trial court would still have given the instruction to the jury but found that there was no disadvantage in trial counsel objecting to it; there was, in the post-conviction court's view, however, an advantage to objecting to the instruction in order to preserve the issue for a successful appeal, as happened in *Lopez-Minjarez*.

The task of a criminal defense attorney is to "prepare himself on the law to the extent appropriate to the nature and complexity of the case." *Krummacher*, 290 Or at 875. To be sure, petitioner's trial, which occurred in 2006, took place four years before *Lopez-Minjarez* was decided; we therefore heed the caution, *Burdge*, 338 Or at 497-98, against evaluating counsel's performance with the benefit of hindsight. Nevertheless, we agree with the post-conviction court that petitioner's counsel failed to exercise professional skill and judgment when he failed to object to the natural and probable consequence instruction. The record supports the conclusion that at the time of trial—in which petitioner was prosecuted on a theory of accomplice liability for all the charges against her yet the state adduced no evidence linking her directly to the hammer-like object or to participation in the assault or robbery of the victim—it was unreasonable for counsel not to question the correctness of the natural and probable consequence instruction. The post-conviction court

found that a comparison of the applicable statute with the uniform jury instruction would reasonably lead counsel to research accomplice liability, which, in turn, would result in discovery of the *Anlauf* decision. Moreover, the record indicates that criminal defense attorneys generally were aware of *Anlauf* and had questioned the continued viability of the instruction in light of that decision.

B.  *Prejudice*

As noted, the post-conviction court determined that petitioner was prejudiced under the state constitution by her trial counsel's inadequate performance, but went on to opine that petitioner had not satisfied the federal standard for demonstrating prejudice. The post-conviction court stated:

> "In respect to [p]etitioner's burden to prove prejudice from counsel's inadequate and ineffective representation, I find that there is a *significant possibility* that a reasonable trier of fact could have concluded that [p]etitioner did not know of or intend to participate in robbery or assault. Trial counsel's error thus had some tendency to affect the result at trial, making it prejudicial under Oregon law. *Stevens v. State*, 322 Or 101, 110 fn 5, 902 P2d 1137 (1995).

> "On the other hand, I cannot say that a reasonable trier of fact *probably* would have drawn such a conclusion. Such a finding that the error is likely to have affected the outcome is the standard for granting relief under federal law. *Strickland*, [466 US at 687-88]."

(Emphases in original.)

Defendant argues that, because we have characterized the standards for inadequate assistance of counsel as "functionally equivalent" under the Oregon and federal constitutions, *Hayward v. Belleque*, 248 Or App 141, 148, 273 P3d 926 (2012), the post-conviction court incorrectly "appeared to believe that Article I, section 11, of the Oregon Constitution imposed a lower standard" for establishing prejudice. Thus, according to defendant, the standard for prejudice is the one articulated under *Strickland*, requiring a petitioner to establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and establishing

that "a reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 US at 694.

We disagree with defendant's premise that the post-conviction court's comments about the federal standard necessarily require a conclusion that petitioner was not prejudiced under the state constitution. The court was asked to, and did, analyze prejudice under the state constitution and cases interpreting it, and defendant fails to make any specific arguments contesting that analysis or establishing that cases decided under the state constitutional standard are incorrect. A generalized comparison between state and federal law hearkening to this court's statement in *Hayward* does not provide us with a sufficient basis to conclude that that analysis was in error.

"Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on predicate findings of fact." *Hayward*, 248 Or App at 148 (citing *Ashley v. Hoyt*, 139 Or App 385, 395 n 8, 912 P2d 393 (1996)). With that in mind, we conclude that the failure of petitioner's trial counsel to object to the natural and probable consequence instruction "had a tendency to affect the result of [her] trial" and, therefore, prejudiced petitioner under Article I, section 11. The instruction went directly to the state's theory of petitioner's liability for the assault and robbery. The state in its closing argument suggested that petitioner may have merely wanted to steal from the victim, or even only wanted to use methamphetamine, implying that the jury did not have to find that petitioner had the intent, required by the statutory requirement for accomplice liability, ORS 161.155(2), to assault the victim with a weapon or to rob him by employing a deadly weapon or causing serious injury. That argument—that petitioner may not have had robbery and assault in mind when she contacted the victim—suggested to the jury that petitioner's intention that night did not have to include the intent of having Pray assault the victim, a man who was romantically interested in her, with a hammer-like object to relieve him of his money and car.

Similarly, the natural and probable consequence instruction permitted the jury to find petitioner guilty of robbery and assault even if the jury concluded that she had

only the intent to facilitate a theft of the victim's money or car. Petitioner acknowledges that there was some nominal evidence that she had conspired to steal money from the victim. There was, however, a lack of evidence directly connecting petitioner with the violence perpetrated against the victim by Pray with an assist from one of the unidentified women. As the post-conviction court found, "a reasonable trier of fact could have concluded that [p]etitioner did not know of or intend to participate in robbery or assault." In other words, the jury could have concluded that petitioner had intended to set up the victim for theft and then found her also to be guilty of robbery and assault because those crimes were the natural and probable consequence of that intention. In light of that discrepancy between what was required of the jury and what they were actually asked to consider, we conclude that the natural and probable consequence instruction would have had "a tendency to affect the result of the prosecution." *Krummacher*, 290 Or at 883. Accordingly, we agree with the post-conviction court that petitioner was prejudiced by trial counsel's unreasonable failure to object to the jury instruction under Article I, section 11.

Having so concluded that there was prejudice under Article I, section 11, we "do not consider [petitioner's] claims under the Sixth Amendment." *Montez*, 355 Or at 7 n 3. It is sufficient that the record supports the conclusion that petitioner was prejudiced under the state constitution. To the extent that the post-conviction court's use of "significant possibility" was in error, which we do not decide here, the claimed error is harmless in light of our conclusion that trial counsel's deficient performance had "a tendency to affect the result of the prosecution," which we decide as a matter of law.

Petitioner was denied adequate assistance of counsel in violation of Article I, section 11, of the Oregon Constitution. She therefore is entitled to post-conviction relief as provided in ORS 138.530.

Affirmed.