LAGESEN, P.J.
*478 Defendant, the superintendent of the Eastern Oregon Correctional Institution, appeals a judgment granting post-conviction relief and setting aside petitioner's convictions and sentences for 11 crimes: four counts of first-degree robbery with a firearm; four counts of second-degree robbery with a firearm; first-degree unlawful sexual penetration; first-degree unlawful sexual penetration with a firearm; and first-degree assault with a firearm.[1] Petitioner cross-appeals. The post-conviction court granted relief on the ground that the failure of petitioner's trial counsel to object to the delivery of the so-called "natural-and-probable-consequences" jury instruction-which the Supreme Court later discredited in State v. Lopez-Minjarez , 350 Or. 576, 260 P.3d 439 (2011) -constituted inadequate and ineffective assistance of counsel, in violation of petitioner's rights under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The post-conviction court did so after concluding that the doctrine of issue preclusion barred the superintendent from contesting that petitioner's trial counsel's failure to object to the instruction was deficient and, further, that petitioner was prejudiced by that failure to object. The court rejected petitioner's other asserted grounds for relief. We conclude that the post-conviction court erred in its application of the doctrine of issue preclusion and also in concluding that petitioner suffered prejudice with respect to his four convictions for second-degree robbery, but that the court did not otherwise err in its prejudice determination. On the appeal, we therefore reverse and remand for further proceedings consistent with this opinion, but we affirm on the cross-appeal.
I. BACKGROUND
A. Underlying Criminal Proceedings
The facts pertinent to the issues before us are not disputed. Petitioner's convictions stem from a jury's finding *479 that petitioner was involved in a brutal home invasion robbery in Banks. Three friends of H, the homeowner-R, G, and C-were in the living room getting ready to view a movie when three masked men burst into the house. The first man to enter the house had his gun drawn and started barking orders; the others may also have been armed. The first man to enter the house appeared to those present to be the group leader.
The intruders ordered R, G, and C to get face down on the floor and to shut their eyes. C was hogtied using zip ties and an extension cord and R's wrists were tied with zip ties. H, a medical marijuana cardholder, was in the bathroom at the time. He had just harvested some of his marijuana and was cleaning his equipment. When he came out of the bathroom, he was hogtied with speaker wire.
The intruders repeatedly asked H and his visitors where the money was and rummaged *454 through the house. When they did not find what they were looking for, one grabbed R by the throat, shook him, and threatened to cut his face with a piece of glass if he did not disclose where the money was; R passed out from the shaking. One of the intruders kicked H in the head, fracturing his eye socket, cheek, and upper jaw.
Unable to get H to admit that there was any more money in the house, the man who appeared to be the group's leader ordered G to strip and get down on her hands and knees, and then violently sexually assaulted her three times in an effort to convince H to admit that there was more money in the house. He first jammed his fist into her vagina, then his gun, and then another object that G could not identify. With each penetration, the intruder asked if his assault on G made a difference in H's denial that there was more money.
Having failed to locate more money, the three men discussed leaving. H, C, and G were all put in the bathtub, stacked on top of one another. One of the intruders held a gun to G's head and cocked the gun, stating that he would kill them. The victims were then told that they would be killed if they called the police. Someone tied the bathroom *480 door shut, and the three men left, taking what money they had found, marijuana, and a few other items.
R regained consciousness after the intruders left. Although his hands and feet were tied, he was able to make his way out of the house and to the neighbors' house while yelling for help. The neighbors called police and tried to remove the zip ties from R's hands. They were able to get one off, but the other one was secured so tightly that they were unable to remove it. Paramedics later were able to cut off the zip tie. R's hand had to be put in a cast to treat the injuries inflicted by the tight zip tie. In the meantime, G, C, and H had managed to free themselves and get out of the bathroom.
Detective Marcom was one of the officers who responded to the incident. H told him that he thought there was a possibility that Felix, who had lived in the house with him previously, was involved. Marcom later arrested Felix, and she disclosed that she had set up the robbery through her friend Lummus and had driven Lummus and another person she did not know to H's house to check it out before the robbery. After Lummus was arrested, he implicated petitioner and another man, Moffett. According to Lummus, petitioner was the person who had led the three into the house, who had carried the gun and provided the zip ties, and who had choked R, kicked H, and sexually assaulted G.
Petitioner was arrested and charged with 15 offenses: four counts of first-degree robbery (one for each victim) by committing theft by using and threatening the use of physical force "while armed with a deadly weapon" (Counts 1 to 4); two counts of first-degree robbery (one each for victims H and R) for committing theft by using physical force "while causing serious physical injury" to H and R (Counts 5 to 6); four counts of second-degree robbery (one for each victim) for committing theft by using and threatening to use physical force "while aided by another person actually present" (Counts 7 to 10); three counts of unlawful sexual penetration committed against G (Counts 11 to 13);[2] and two counts of first-degree assault (one count each for victims *481 H and R) for "[cause] serious physical injury" by means of the zip ties (Counts 14 to 15).
At trial, Lummus testified for the state and, consistent with Lummus's version of events, the state's theory was that petitioner had been the first to enter the house and was the one who had choked R, kicked H, and sexually assaulted G. The state's alternative theory was that, even if petitioner was not the ringleader, he was one of the other intruders and was necessarily liable as a principal or accomplice on all of the charges by virtue of that fact. Petitioner's defense was that he was not one of the intruders and that Lummus was lying to secure a good plea deal. On the state's request, the trial court provided the "natural-and-probable-consequence" instruction to the jury as part of the instructions addressing accomplice liability.
*455 As a whole, the instructions regarding accomplice liability provided:
"So, what is aiding and abetting? A person aids or abets another in the commission of a crime if, with the intent to promote or make easier the commission of the crime, that person either encourages, or procures, or advises, or assists, either by acting or by advice, the planning or commission of the crime.
"* * * * *
"A person who aids or abets another person in committing a crime, in addition for being criminally responsible for the crime that is committed, is also criminally responsible for any act or other crimes that were committed as a natural and probable consequence of the planning, preparation or commission of the intended crime."
In closing argument, the state explained that, under its aiding-and-abetting theory, all three intruders and Felix were culpable for all of the crimes:
"As a side note, I'm going to get to the aid and abet instructions momentarily, but when I say the defendant committed * * * 'X,' 'Y,' or 'Z,' that can be the defendant; that can be Tammy Felix, who set the whole thing up; that can be Robert Lummus; that can be Ryan Moffett. Because remember everybody is responsible for the conduct of everyone else."
*482 Later, discussing the instructions specifically, the prosecutor explained that, in the context of the case, the natural-and-probable-consequence instruction might mean that Felix could not be held liable on the sexual penetration charges because "[i]t's not necessarily a natural and probable consequence of a robbery that somebody is going to be sexually assaulted." But, the prosecutor argued, with respect to the three men in the house that night, that everybody was responsible for everything that happened:
"Now, what do we have in this particular case? We have all three defendants who are in the house. All three defendants who are there when the people are hurt. All three defendants are there when people are tied up. And all three defendants are there when [G] is sexually assaulted. What's more, we have all three defendants who continued to participate in the robbery when [G] is sexually assaulted.
"Now, I expect when you go back and you talk amongst yourselves, and you look at all the evidence, that you're going to find that the person who shoved his fist into the vagina from behind of [G] is [petitioner]. The person who shoved his gun into the vagina from behind of [G] is [petitioner].
"But, if you find that another person that was there was actually responsible for that, it changes in no way the defendant's liability for that. Why? Because when this robbery goes too far, when-if you find that this defendant didn't sign up for that part, then his actions need to show it. At that point he drops the stolen property, he walks out the door, and he goes and he calls 9-1-1, and he says 'You know what, I'm sorry, I signed up for a robbery, I didn't sign up for this horrible sexual assault of this woman.'
"Instead, what everybody did, what all three people did, and what makes them all on the hook for this, is when the defendant committed this horrible crime, everyone else stayed put, everyone else commits-continued with the robbery. Everybody else participated in assaulting the victims, everybody else participated in stacking them in the bathtub, locking up the door, and they all left together. They all left together with stolen property that was divided among themselves * * *."
The jury found petitioner guilty on all 10 robbery counts, the two counts of unlawful sexual penetration, and *483 the count of assault against R. The jury acquitted petitioner on the assault count involving H. Petitioner then appealed. Relying on the Supreme Court's then-recent decision in Lopez-Minjarez , 350 Or. 576, 260 P.3d 439, he assigned as plain error the trial court's delivery of the "natural-and-probable-consequence" instruction, as well as the trial court's failure to merge the guilty verdicts on Counts 1 and 5 (the two counts of first-degree robbery with H as a victim) and on Counts 4 and 6 (the two counts of first-degree robbery with R as a victim). *456 State v. Edwards , 251 Or. App. 18, 281 P.3d 675, rev. den. , 352 Or. 665, 293 P.3d 226 (2012). We rejected petitioner's jury instruction challenge on the ground that ORCP 59 H(1) made it unreviewable, but, on the state's concession, determined that the trial court plainly erred when it failed to merge the guilty verdicts on Counts 1 and 5, and Counts 4 and 6, and remanded to the trial court to correct that error.[3] Id .
B. Post-Conviction Proceedings
Thereafter, petitioner initiated this post-conviction proceeding. He alleged that his trial counsel was inadequate and ineffective for not objecting to the delivery of the natural-and probable-consequence instruction that the Supreme Court invalidated in Lopez-Minjarez , among other grounds for relief. The post-conviction court ultimately granted relief on that ground in a two-step process. First, on petitioner's motion for partial summary judgment, the court ruled that, in view of the prior case of Wade v. Brockamp , 268 Or. App. 373, 342 P.3d 142 (2015), the doctrine of issue preclusion barred the superintendent from contesting that trial counsel performed deficiently by failing to object to the natural-and-probable-consequence instruction. Based on that determination, the court further concluded that, as a matter of law, trial counsel's failure to object to the natural-and-probable-consequence instruction constituted deficient performance as a matter of law. Then, following a hearing, the post-conviction court determined that that deficiency could have affected the jury's verdict on all counts of conviction *484 and, thus, the deficiency prejudiced petitioner with respect to all counts of conviction. The court rejected petitioner's remaining asserted grounds for relief.
The superintendent appeals and petitioner cross-appeals. The superintendent assigns error to the post-conviction court's grant of relief, contending that the court erred by ruling on summary judgment that the doctrine of issue preclusion barred the superintendent from contesting that counsel performed inadequately, and also that the court erred in concluding that counsel's deficiency prejudiced petitioner on any of the counts of conviction. In his cross-appeal, petitioner contends that the post-conviction court erred in rejecting the other asserted grounds for relief.
II. STANDARDS OF REVIEW AND GENERAL LEGAL STANDARDS
We generally review a post-conviction court's grant or denial of relief for legal error, accepting the court's implicit and explicit factual findings if there is evidence to support them. Green v. Franke , 357 Or. 301, 312, 350 P.3d 188 (2015). With respect to the post-conviction court's grant of partial summary judgment, "[w]e review the post-conviction court's grant of summary judgment to determine whether the court correctly concluded that there are no genuine issues of material fact and that [the superintendent] was entitled to judgment as a matter of law." Putnam v. Angelozzi , 278 Or. App. 384, 388, 374 P.3d 994 (2016).
At issue in this matter are parallel claims of inadequate assistance of trial counsel under Article I, section 11, and ineffective assistance of trial counsel under the Sixth Amendment. To establish that his trial counsel rendered inadequate assistance for purposes of Article I, section 11, petitioner was required to prove two elements: (1) a performance element-that trial counsel "failed to exercise reasonable professional skill and judgment"; and (2) a prejudice element-that "petitioner suffered prejudice as a result of counsel's inadequacy." Johnson v. Premo , 361 Or. 688, 699, 399 P.3d 431 (2017). A functionally equivalent two-element standard governs petitioner's claim of ineffective assistance of counsel under the Sixth Amendment. Id . To prevail on that claim, petitioner was required to demonstrate that *485 "trial counsel's performance 'fell below an objective standard of reasonableness,' " and also that "there was a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *457 Id . at 700, 399 P.3d 431 (quoting Strickland v. Washington , 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ). We examine the challenged rulings of the post-conviction court in light of those standards. As neither party suggests that, with respect to those particular claims, the state and federal constitutions require separate analyses, our analysis below applies to petitioner's claims under both constitutions.
III. ANALYSIS
A. The Superintendent's Appeal
The superintendent contends that the post-conviction court erred in two different ways. First, the superintendent contends that the post-conviction court erred when it concluded that trial counsel's failure to object to the delivery of the natural-and-probable-consequence instruction prejudiced petitioner with respect to any of his 13 convictions. The superintendent further asserts that that error means that the grant of post-conviction relief should be reversed with respect to all of petitioner's convictions. Second, the superintendent argues that the post-conviction court erred when it determined, on summary judgment, that the doctrine of issue preclusion barred the superintendent from contesting that trial counsel was inadequate for not objecting to the natural-and-probable-consequence instruction, and that we must reverse and remand for further proceedings to address the adequacy of counsel's performance. We conclude that the post-conviction court correctly determined that the delivery of the natural-and-probable-consequence instruction prejudiced petitioner with respect to his convictions for sexual penetration and assault, but erred in concluding that the instruction prejudiced petitioner with respect to the robbery convictions. We also conclude that the post-conviction court erred when it ruled that the doctrine of issue preclusion barred the superintendent from contesting whether trial counsel performed inadequately by failing to object to the delivery of the natural-and-probable-consequence instruction.
*486 1. Prejudice
We start with the superintendent's challenge to the post-conviction court's determination of prejudice because, were the superintendent to succeed on that challenge, it would obviate the need to address the superintendent's challenge to the trial court's ruling on the performance element of petitioner's claim. See Drown v. Persson , 294 Or. App. 754, 432 P.3d 1144 (2018) (addressing question of whether a post-conviction petitioner was prejudiced by the delivery of the natural-and-probable-consequence instruction because a determination of no prejudice would be dispositive of the appeal).
In our recent decision in Drown , we described the general framework for evaluating whether a post-conviction petitioner was prejudiced by his or her trial counsel's failure to object to the delivery of the natural-and-probable-consequence instruction discredited in Lopez-Minjarez. As the Supreme Court explained in Lopez-Minjarez , the risk of harm created by the natural-and-probable-consequence instruction is that it permits a jury to convict a defendant for a crime without requiring the jury to find that the defendant had the requisite criminal intent with respect to that crime. Lopez-Minjarez , 350 Or. at 582-84, 260 P.3d 439. In general, however, for that risk of harm to have materialized with respect to one or more convictions, there must be some likelihood that the jury could have found the defendant guilty of a prior offense under an ordinary aiding-and-abetting theory. Thus, as we explained in Drown , to determine whether a post-conviction petitioner was prejudiced by the delivery of the natural-and-probable-consequence instruction,
"we must determine whether, in light of the parties' evidence and arguments, the jury's guilty verdict on one or more of the charges could have been based on the theory of criminal responsibility contained in the erroneous instruction. Stated differently, for each charged crime, we must determine whether the jury could have found the defendant guilty of the crime on the theory that the crime was a natural and probable consequence of an earlier crime in which the defendant had aided or abetted. That inquiry requires that we first identify in time the initial, intended crime for *487 which the jury could have found the *458 defendant guilty based on an ordinary accomplice theory. That is because to trigger criminal responsibility under the erroneous instruction, the jury first had to find defendant guilty of at least one predicate crime on an accomplice (i.e. , aiding and abetting) theory."
294 Or. App. at 760, 432 P.3d 1144 (internal quotation marks and citations omitted). As noted, we conduct that inquiry by examining the parties' evidence and arguments.[4] Id.
Having conducted that inquiry in this case, we disagree with the post-conviction court that the instruction prejudiced petitioner with respect to all of his convictions. Given the evidence and the theory of the case that the prosecution presented to the jury,[5] we conclude that the instruction did not have a tendency to affect the jury's verdict on the four second-degree robbery charges, Counts 7 to 10, but that it did with respect to the remaining counts.
Under Drown , we must identify the first-in-time convictions, if any, on which the jury could have found petitioner guilty as an ordinary accomplice. On the record in this case, those first-in-time convictions are the second-degree robbery charges (Counts 7 to 10). The prosecutor pitched the case to the jury in that manner, basically arguing that the intruders committed second-degree robbery by "march[ing] in" the way that they did to commit the theft that they did:
"[I]f they had marched in, and none of them had a gun, and they didn't cause any injuries to the victims, but they were aided by another person actually present, there was more than one person that came in, and threatened the use of physical force during the commission of theft, that would be Robbery in the Second Degree."
Although, as was the case in Lopez-Minjarez itself, the jury could have found petitioner guilty on those charges as a *488 principal, there is also some likelihood that the jury convicted petitioner as an ordinary accomplice without determining that he committed the elements of the offense himself. That is because the prosecutor explicitly told the jury that it could think of the case in that manner and treat the different participants in the incident interchangeably: "[W]hen I say the defendant committed * * * 'X,' 'Y,' or 'Z,' that can be the defendant; that can be Tammy Felix, who set the whole thing up; that can be Robert Lummus; that can be Ryan Moffett. Because remember everybody is responsible for the conduct of everyone else."
That means, on the record in this case, there is some likelihood that the jury's verdicts on the remaining counts against petitioner could have turned on the erroneous natural-and-probable-consequence instruction. The instruction allowed the jury to convict petitioner on the first-degree robbery counts without finding that he had the requisite criminal intent with respect to the use of a gun or the causing of physical injury; it also allowed the jury to convict him of the charges of unlawful sexual penetration and assault without finding that he had the requisite criminal intent with respect to those charges. That is particularly so in light of how the prosecutor framed the case for the jury in closing argument. The prosecutor effectively told the jury that petitioner was on the hook for all charges even if all he "signed up for" was robbery because there was no evidence that he took action, such as calling the police, to admit that he had intended to participate in the robbery but not the other offenses. That argument, together with the prosecutor's argument that petitioner would be liable for second-degree robbery if the intruders had simply marched in to commit the thefts without using a gun or causing injuries, invited the jury to conclude that petitioner was liable for all charged offenses, simply by virtue of his participation in the second-degree robbery. The natural-and-probable-consequence instruction, with its erroneous indication that the jury could convict *459 petitioner of an offense without finding that he had the requisite criminal intent, reinforced that argument to the jurors and, thus, could have affected the verdicts on the counts other than the four second-degree robbery counts. *489 Thus, we conclude that petitioner was not prejudiced by trial counsel's failure to object to the natural-and-probable-consequence instruction with respect to Counts 7 to 10.
Petitioner urges us to reach a different conclusion and affirm the post-conviction court's conclusion that the instruction was prejudicial as to all counts of conviction. Relying on Wade , petitioner argues that a different analysis applies. Petitioner notes that, in Wade , we concluded that the delivery of the natural-and-probable-consequence instruction was prejudicial based on our conclusion that the jury might have relied on the instruction to convict the petitioner of robbery and assault under the theory that those offenses were the natural-and-probable consequence of the petitioner's decision to facilitate the uncharged offense of theft. 268 Or. App. at 389-90, 342 P.3d 142. Petitioner points out, correctly, that that analysis did not require us to determine, as we did in Drown , that the jury could have convicted petitioner of an earlier offense under an aid-and-abet theory. He argues that, in this case, as in Wade , the jury could have convicted him of all offenses under the theory that all of those offenses were the natural-and-probable consequence of a prior uncharged theft.
We reject that argument for two reasons. First, nothing in the evidence or the arguments presented at petitioner's criminal trial would have suggested to the jury that that was a viable theory of conviction. There is simply no reason to think that the jury viewed the case in that manner. Petitioner acknowledged as much below, telling the court that he did not think the erroneous instruction likely affected the jury's verdict on the second-degree robbery charges.
Second, and relatedly, the prejudice analysis in Wade did not follow the same path as our analysis in Drown . That is because the prosecutor in that case argued to the jury that it could convict the petitioner without finding that she intended to assist in the charged robbery and assault but, instead, could do so even if it found that she only had intended to facilitate an uncharged offense such as theft. Wade , 268 Or. App. at 377, 389, 342 P.3d 142. In view of the specific way *490 that the prosecutor presented that case to the jury-which, in essence, invited the jury to convict the petitioner on the basis that the charged offenses were the natural-and-probable consequence of the petitioner's decision to aid and abet an uncharged theft-we concluded that the instruction was prejudicial. Here, by contrast, no such theory was presented to the jury and, for the reasons that we explained in Drown ,[6] the instructions on aiding-and-abetting liability, when considered as a whole, do not suggest to the jury that it is permissible to convict a defendant of an offense under a natural-and-probable-consequence theory without having first found the defendant guilty of at least one offense under an ordinary aiding-and-abetting theory. We therefore reject petitioner's argument that Wade requires us to engage in a different prejudice inquiry than the one set forth in Drown , given the context of this case.
In sum, petitioner was prejudiced by trial counsel's failure to object to the natural-and-probable-consequence instruction with respect to Counts 1 to 6, 11, 12, and 15. Petitioner was not prejudiced by the failure to object with respect to Counts 7 to 10. The post-conviction court erred to the extent that it concluded otherwise.
2. Issue preclusion
Because we have concluded that petitioner was prejudiced by trial counsel's failure to object to the delivery of the natural-and-probable-consequence instruction, we must also address the superintendent's contention *460 that the post-conviction court erred when it determined that the doctrine of issue preclusion barred the superintendent from contesting the conclusion that petitioner's trial lawyer performed inadequately by not objecting to the natural-and-probable-consequence instruction because that same issue previously had been resolved by Wade , 268 Or. App. 373, 342 P.3d 142. We conclude that the court erred. *491 Under the doctrine of issue preclusion, "[i]f one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met[.]" Nelson v. Emerald People's Utility Dist. , 318 Or. 99, 104, 862 P.2d 1293 (1993). The first of those requirements is that the issue in the two proceedings must be "identical." Id . That requirement is not met here.
In this case, the pertinent issue is whether petitioner's trial counsel, in not objecting to the trial court's delivery of the natural-and-probable-consequence instruction, "failed to exercise reasonable professional skill and judgment * * *." Pereida-Alba v. Coursey , 356 Or. 654, 661, 342 P.3d 70 (2015). The resolution of that issue necessarily turns on an examination of the historical facts and circumstances underlying petitioner's counsel's failure to object to the instruction. Id . at 662, 342 P.3d 70 ; Johnson , 361 Or. at 710, 399 P.3d 431 ("What constitutes 'reasonable professional skill and judgment' in defending criminal charges is a highly fact-specific inquiry."). The issue in Wade , by contrast, was whether trial counsel for the petitioner in that case failed to exercise reasonable professional skill and judgment by not objecting to the delivery of the natural-and-probable-consequence instruction under the facts and circumstances of that case. See Wade , 268 Or. App. at 385, 342 P.3d 142 (explaining why, on the record created in that case, the post-conviction court correctly determined that the petitioner's criminal trial lawyer failed to exercise reasonable professional skill and judgment by not objecting to the natural-and-probable-consequence instruction). Although similar, the two issues are not identical, because the issues involve different lawyers in different cases in different factual circumstances.
It may be that the facts surrounding trial counsel's failure to object, when fully developed on remand, will be materially indistinguishable from the facts developed in Wade , such that the holding in Wade will compel the legal conclusion that petitioner's trial counsel performed inadequately in the same way that the lawyer at issue in Wade performed inadequately. But that will be because principles of stare decisis compel that conclusion, not because the doctrine of issue preclusion does.
*492 In sum, the post-conviction court erred in determining that the doctrine of issue preclusion barred the superintendent from contesting whether trial counsel was inadequate for not objecting to the natural-and-probable-consequence instruction and in granting partial summary judgment to petitioner on that basis.
B. Petitioner's Cross-Appeal
In his cross-appeal, petitioner assigns error to the post-conviction court's denial of relief on two additional specifications of inadequate and ineffective assistance of counsel. Having considered those assignments of error, we reject them without further discussion.
IV. CONCLUSION
For the foregoing reasons, we reverse the judgment granting post-conviction relief and remand for further proceedings consistent with this opinion.
Reversed and remanded on appeal; affirmed on cross-appeal.

The jury returned guilty verdicts on two additional counts of first-degree robbery with a firearm. In petitioner's direct appeal, we held that the verdicts on those counts merged with the verdicts on other counts. State v. Edwards , 251 Or. App. 18, 24, 281 P.3d 675, rev. den. , 352 Or. 665, 293 P.3d 226 (2012).

One count of unlawful sexual penetration was later dismissed.

Our decision in petitioner's direct appeal that ORCP 59 H rendered his claim of instructional error unreviewable turned on a line of cases that the Supreme Court later overruled in State v. Vanornum , 354 Or. 614, 317 P.3d 889 (2013).

The analysis that the superintendent sets forth in his brief is consistent with the framework we set out in Drown .

As noted, petitioner's defense was that he was not a participant in the robbery; apart from pointing to reasons why the jury should have reasonable doubt about petitioner's participation in the crime, trial counsel only minimally contested the prosecutor's theory of the case.

As we explained in Drown ,
"[b]y its terms, the instruction subjects a defendant to liability for conduct occurring after the defendant aids or abets another in committing an initial offense; that is, it 'also' imposes liability for 'acts or other crimes that [are] committed' in addition to the 'intended crime.' "
294 Or. App. at 759, 432 P.3d 1144 (quoting the natural-and-probable-consequence instruction).