Argued and submitted March 8, 2019; reversed and remanded with instructions for the post-conviction court to grant petitioner relief on Counts 2 to 10 and Count 12, otherwise affirmed May 20, 2020

PATRICK ALLEN McMILLAN,
*Petitioner-Appellant,*

*v.*

Brandon KELLY,
Superintendent, Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
13C13523; A163801

467 P3d 791

Petitioner appeals a judgement denying him post-conviction relief. On appeal, petitioner contends that, during his criminal trial, his trial counsel was inadequate and ineffective for failing to object to the "natural-and-probable-consequence" jury instruction, which the Supreme Court declared to be a misstatement of Oregon law in *State v. Lopez-Minjarez*, 350 Or 576, 582, 260 P3d 439 (2011), and for failing to object to the prosecutor's closing argument, which misstated Oregon law as to accomplice liability. *Held*: The post-conviction court erred. Petitioner's trial counsel's performance was constitutionally deficient when he failed to object to the natural-and-probable-consequence jury instruction and failed to object to the prosecutor's closing argument. Additionally, for 10 of the 12 crimes of which the jury convicted petitioner, the natural-and-probable-consequence jury instruction, coupled with the prosecutor's closing argument, could have had a tendency to affect the result of the prosecution.

Reversed and remanded with instructions for the post-conviction court to grant petitioner relief on Counts 2 to 10 and Count 12; otherwise affirmed.

Linda Louise Bergman, Senior Judge.

Jason Weber argued the cause for appellant. Also on the brief was O'Connor Weber LLC.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Reversed and remanded with instructions for the post-conviction court to grant petitioner relief on Counts 2 to 10 and Count 12; otherwise affirmed.

**TOOKEY, J.**

In 2007, a woman, C, who had stolen a necklace belonging to petitioner's wife was, among other things, kidnapped, assaulted, and strangled. For petitioner's role in the crimes committed against C, he was charged with 13 offenses. During petitioner's criminal trial, the prosecutor put to the jury a theory of criminal liability in which petitioner turned C's domestic partner, Kenny McKee, "into a weapon."[1] The prosecutor argued, among other points, that, even if petitioner did not intend for many of the crimes committed against C to happen, he was nevertheless criminally responsible for them, as he put criminal conduct committed by Kenny into motion.

A jury ultimately convicted petitioner of 12 offenses. Petitioner sought post-conviction relief and now appeals a judgment denying him that relief, raising three assignments of error. All three assignments concern a theory of accomplice liability and the "natural and probable consequence" jury instruction given during his 2009 criminal trial, which have since been declared by the Supreme Court to be a misstatement of Oregon law. *State v. Lopez-Minjarez*, 350 Or 576, 582, 260 P3d 439 (2011).

In his first assignment of error, petitioner contends that his trial counsel was inadequate and ineffective for failing to object to the natural-and-probable-consequence instruction and, in his second assignment of error, he contends that his trial counsel was inadequate and ineffective for failing to object to the prosecutor's closing argument that misstated Oregon law as to accomplice liability. In petitioner's third assignment of error, he contends that his appellate counsel was inadequate and ineffective during petitioner's direct appeal for failing to assign plain error to the trial court giving the natural-and-probable-consequence jury instruction.

For the reasons that follow, we conclude that petitioner's trial counsel's performance was deficient when he failed to object to the natural-and-probable-consequence

---

[1] In this opinion, to avoid confusion, we refer to Kenny McKee as "Kenny," because his cousin, Gary McKee, also played a role in the conduct that led to petitioner's convictions. Gary McKee is referred to as "Gary" in this opinion.

instruction and failed to object to the prosecutor's closing argument regarding accomplice liability, and that that deficient performance prejudiced petitioner as to some, but not all, of his convictions. We reverse and remand with instructions to grant relief on Counts 2 to 10 and Count 12. We reject petitioner's third assignment of error.

## I.  BACKGROUND

In 2007, a necklace was stolen from petitioner's house by the victim, C. C lived with Kenny, her domestic partner, in a trailer on Schaffer Road. On December 7, 2007, C was injured when petitioner and Kenny undertook to retrieve the necklace from C. Both Kenny and petitioner were arrested and charged for conduct that the state believed that they engaged in when attempting to retrieve the stolen necklace.[2] More specifically, an amended indictment charged petitioner with 13 crimes: attempted murder with a firearm, ORS 161.405 and ORS 163.115 (Count 1); first-degree kidnapping with a firearm, ORS 163.235 (Count 2); second-degree assault with a firearm, ORS 163.175 (Count 3); third-degree assault with a firearm, ORS 163.165 (Count 4); fourth-degree assault, ORS 163.160 (Count 5); strangulation, ORS 163.187 (Count 6); two counts of coercion with a firearm, ORS 163.275 (Count 7 and 8); menacing, ORS 163.190 (Count 9); recklessly endangering another person, ORS 163.195 (Count 10); felon in possession of a firearm, ORS 166.270 (Count 11); unlawful use of a weapon, ORS 166.220 (Count 12); and first-degree burglary with a firearm, ORS 164.225 (Count 13).

Petitioner pleaded not guilty to the charges against him and proceeded to trial.

### A.  *C's Trial Testimony*

During petitioner's trial, the state relied principally on C's testimony. She testified to the following version of events:

C was at petitioner's house and, while there, she took a necklace from the bathroom counter. Later, upon

---

[2] Kenny pleaded guilty in a separate criminal proceeding and did not testify during petitioner's criminal trial.

learning petitioner was looking for the necklace, C hid the necklace in someone else's house. Shortly thereafter, C and Kenny were staying at the trailer on Schaffer Road, which was located on property owned by J. At approximately 3:00 a.m. on December 7, 2007, C woke up to someone banging on the trailer door. C opened the door and saw petitioner and Kenny's cousin, Gary McKee, standing outside. Petitioner and Gary entered the trailer, and C sat on her bed. Petitioner grabbed C by her shirt, dragged her over to a bench in the trailer, and asked her "where the fuck his necklace was."

C denied knowing where the necklace was, and petitioner told her that he was going to "hit [her] like a man if [she] didn't give it up." After C repeatedly denied knowing where the necklace was, petitioner started hitting her. Gary then left the trailer. C did not want petitioner to remain in the trailer at that point. Additionally, after petitioner started hitting C, C saw that petitioner had a gun and that petitioner had set the gun on the table next to C.

Petitioner then told Kenny to "check his bitch," that petitioner wanted his necklace back, and that petitioner was going to kill both Kenny and C. Kenny then started hitting C. At that point, both petitioner and Kenny were yelling at C about the necklace.

Petitioner then rubbed the gun against C's face. Petitioner and Kenny then made threats to hurt C's son if C did not return the necklace, and took turns beating her. Additionally, Kenny said to petitioner, "let's just kill [C]." Eventually, Kenny choked C and she lost consciousness. At some point prior to Kenny choking C, both petitioner and Kenny hit C in the face with the gun.

When C awoke, Kenny, again, beat C. Petitioner said, "We're just going to kill her," and shot the gun at C from approximately two feet away. The bullet went within a foot of the left side of her face. At that point, C told petitioner and Kenny where the necklace was.

Petitioner told C that she could not leave the trailer until her wounds had healed and that, if she tried to leave, petitioner would find her. Gary entered the trailer, and

Kenny and petitioner told Gary to watch C and help her get cleaned up. C did not leave the trailer because Gary was watching her. In any event, C could not have left because she did not have a car and the trailer was in the "middle of nowhere."

Petitioner and Kenny left the trailer. C then fell asleep. Later, Kenny returned to the trailer, and also fell asleep.

Approximately four days after the crimes against C, C went to the hospital. The hospital called the police.

C told the police a version of the events that she testified to during petitioner's trial.

B. *Gary's Trial Testimony*

The prosecutor also called Gary as a witness. Gary testified to the following version of events:

Gary telephoned petitioner to get a ride to J's property. They drove to the property and arrived there "sometime midmorning" when it was "still dark." When they arrived, Gary and petitioner went to the trailer, Gary knocked, and C answered the door. Gary asked if C or Kenny had a pipe to smoke methamphetamine with, and neither of them did, so he left to go find out if anyone else who was staying at J's property had a pipe.

Subsequently—after procuring a pipe from someone else on J's property and using it to smoke methamphetamine—Gary heard a gunshot and walked back toward the trailer. Gary saw petitioner outside and "a ways away" from the trailer. Gary then walked past petitioner and into the trailer. Once inside, he saw C covered in blood, slumped over and unconscious. Gary thought C was dead. Gary also saw Kenny. Kenny had blood on him and was "pretty filthy." Kenny said "she got what she had coming" and "I broke my hand on that bitch"; and Kenny was generally throwing "a fit." Additionally, Kenny's hand was swollen and his "knuckle was pushed pretty far back in his hand." By contrast, petitioner looked "clean," but "a little disturbed." Kenny and Gary were in the trailer when C regained consciousness, and subsequently, Kenny was in and out of the

trailer, yelling at C. Gary observed Kenny with a gun later that morning.

Gary told C—of his own volition—that, "for [her] own safety," she should stay at the trailer because there was "no way to make it back to town." During the trial, Gary explained that, because there was snow outside, C would "leave a trail" if she tried "to run" and Kenny was "liable to do anything." Gary testified that he viewed this advice to C as "common sense."

Later, petitioner asked Gary to retrieve a motor home that belonged to Kenny from petitioner's house, because petitioner did not want Kenny to return to petitioner's house, and petitioner "really couldn't believe what[ was] going on." Gary did so.

Gary also testified that Kenny always had a gun on him and that he had never seen petitioner touch a gun. Additionally, Gary testified that Kenny "did this" to his first wife as well, and that both Kenny and Gary had been charged with crimes and pled guilty in relation to what happened to C the morning of December 7, 2007.

C. *Petitioner's Trial Counsel's Efforts to Impugn C's Credibility*

Given C's testimony about petitioner's conduct, petitioner's trial counsel attempted to impugn C's credibility regarding what occurred in the early morning hours of December 7, 2007. To that end, he elicited testimony concerning her relationship with Kenny and her knowledge of various aspects of Kenny's conduct. For example, he elicited testimony that (1) even after Kenny's conduct toward C on December 7, 2007, C lived with Kenny in an apartment until late January 2008, when Kenny was arrested; (2) at the time of his arrest, Kenny was in possession of the gun that had been used against C on December 7, 2007; (3) the apartment that Kenny and C lived in following the events of December 7, 2007, was rented under a fake name; (4) at the apartment were 14 keys that Kenny had used to steal cars, as well as a stolen car, with license plates that belonged to C; and (5) at the time she was residing at the trailer on

Schaffer road with Kenny, C was aware that the trailer had been stolen by Kenny.

Additionally, defense counsel elicited testimony indicating that (1) after receiving a grand jury subpoena, C told a deputy that she wanted to recant her statement to law enforcement concerning what occurred on December 7, 2007, because she was scared Kenny would get into trouble based on what she had reported; (2) C traveled with Gary to California at some point after the events that occurred on December 7, 2007; (3) when giving a statement to police prior to petitioner's trial, C indicated that either Kenny or petitioner shot the gun at her, but did not identify petitioner specifically at that time; (4) C made a written statement to police in which she told police that after being pulled off the bed by petitioner she told him where the necklace was and that petitioner and Kenny's conduct *vis-à-vis* C ensued after that disclosure, which contradicted aspects of C's testimony during petitioner's trial; and (5) that C had stolen items in addition to the necklace from petitioner's house, which also contradicted aspects of C's testimony during petitioner's trial.

D.  *Jury Instructions, Closing Arguments, and Petitioner's Direct Appeal*

As relevant here, the trial court gave two instructions regarding accomplice liability. The first instruction provided:

> "Aid or abet. A person aids or abets another person in the commission of a crime if the person, one, with the intent to promote or make easier the commission of the crime, two, engages, procures, advises or assists, by act or advice, the planning or commission of the crime."

The second instruction, often referred to as the "natural-and-probable-consequence" instruction—which is the instruction at issue in this appeal—provided:

> "Aider and abettor. A person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed, is also criminally responsible for any acts or other crimes that were

committed as a natural and probable consequence of the planning, preparation, or commission of the intended crime."

After instructing the jury as to the elements of the crimes for which petitioner was charged, the trial court read the verdict form to the jury. Below Count 1, attempted murder; Count 2, first-degree kidnapping; Count 3, second-degree kidnapping; Count 4, third-degree assault; and Counts 7 and 8, coercion; the verdict form included the following question:

"If you find defendant guilty of this Count, answer the following question:

"Did Defendant use, or threaten to use, a firearm?"

In his closing argument, the prosecutor began by explaining to the jury why the charges in the indictment were not in chronological order—*viz.*, "you don't always know exactly what order things happen because sometimes things happen simultaneously or sometimes people get confused about the way things happen" and "courts also have a rule" where "[t]hey say we want the most serious [charges] first and then go down from there."

The prosecutor then cursorily discussed many of charges in the indictment, and when doing so, explained one of his theories as to how petitioner might have committed some the crimes charged therein.

About Count 2, first-degree kidnapping, the prosecutor explained:

"The first thing that happened was, if you recall [C's] testimony, she was in bed and the door's knocked on. She gets up and she then the kidnapping started first. That's when—at that moment, you look at count 2, which is kidnapping, that's when her personal liberty was taken from her. Fortunately in this case temporarily because she got it back. But for a period of time she did not have her personal liberty. Why not? Because she was being beaten. She was not at liberty to stop that. She was not at liberty to go.

"* * * * *

"The state would submit to you there is no requirement in this instruction that you've been read by the court, and

the statute that it's based on that we're trying, that she was confined for 31-and-a-half minutes, 62-and-three-quarter minutes, 1.7 minutes. Once she's confined, that is not free to go, and the person who is confining her has the intent to hurt her and her liberty is substantially impaired, that's a kidnap."

About Count 3, second-degree assault, the prosecutor argued that that crime occurred on the two occasions when C was struck in the head with the gun.

About Count 4, third-degree assault, the prosecutor argued that that crime occurred when petitioner and Kenny took turns beating and kicking C. Presumably given the testimony concerning the severity injuries to Kenny's hand, the prosecutor acknowledged that Kenny, not petitioner, "probably did the majority of it."

About Count 5, fourth-degree assault, the prosecutor argued that, if the jury found guilt as to second-degree assault or third-degree assault, it should find petitioner guilty of fourth-degree assault, because "that's how they stack up."

About Count 6, strangulation, the prosecutor explained that that crime is committed by "using something, in this case, * * * hands around the person's throat to impede their breathing" and that C was strangled until she passed out.

About Counts 7 and 8, coercion, the prosecutor did not specify what acts constituted coercion, but argued:

"There's two separate counts of Coercion.

"Well, was she coerced more than once? No, there was one act of Coercion but it violated two parts of the statute, because you can coerce somebody by making them not do something they can do, or you can coerce them by forcing them to do something they don't want to do, and rather than have one count of coercion and later on having to shake our heads and scratch and say well, which one did the jury believe or not believe, you wouldn't be able to tell from that indictment.

"So now you got two separate indictments and if you slip on the theory of Coercion you can easily inform the court of that. We find that there was Coercion in this way and not

in this way, or yes in both ways or no for both ways. That makes it a little cumbersome and maybe somewhat hard to get your theoretical mind around but that's the way it's done and that's why they're there."

About Count 9, menacing, the prosecutor explained that menacing "is just threatening someone with injury," but did not detail what specific aspect of petitioner or Kenny's conduct constituted menacing.[3]

About Count 10, recklessly endangering another person, the prosecutor explained that that crime occurred when the gun was shot at C's head.

About Count 12, the prosecutor explained that "Unlawful Use of a Weapon just means you have a weapon and you intend to use it against someone," and in this case, the prosecutor contended, the weapon was a pistol.

About Count 13, first-degree burglary, the prosecutor explained that the trailer was Kenny and C's residence, and, as relevant to our analysis, explained his theory as to the "unlawful entry or remaining" element of burglary as follows:

> "Now, the question really comes down to was this an unlawful entry or remaining? Let's talk about remaining. Probably lawful entry. She sees—she hears the door. She goes to the door, opens the door, so that was voluntarily done. Once [petitioner] got inside, however, her testimony to you was I didn't want this—I didn't want him there anymore.

> "Why? He was beating the daylights out of me, and Ken was beating the daylights out of me over this necklace thing. Now, the state submits to you that the—even though [petitioner] entered probably okay, he converted that entry into an illegal entry by changing his conduct to criminal conduct and staying there long enough to participate in her physical injury."

---

[3] On appeal, during oral argument, the superintendent noted that the "prosecutor didn't really identify what the menacing was attached to," but hypothesized that it could have occurred when petitioner told Kenny to "check his bitch."

The prosecutor then argued that the evidence established that petitioner was at least present at the trailer on December 7, 2007, and that on that day, at that location, C was badly beaten. The prosecutor next turned to what he called an "alternate" theory for "who's responsible" for the crimes against C. As reflected in the excerpt below, the prosecutor's "alternate" theory was that petitioner aided and abetted Kenny's commission of crimes against C, arguing to the jury that, even if Kenny committed much of the conduct that C ascribed to petitioner during her testimony, it could still convict petitioner because petitioner set Kenny's conduct into motion:

> "I'm not going to necessarily go into each individual count. I like to talk in general because frankly, *members of the jury, it's the state's position that if the* [*petitioner's*] *in for any one of these, he's in for all of them*, because they all happened as a package, one after the other after the other after the other.

> "*** What was going on? [Petitioner] is there and he's angry about the necklace. I think we know this ***.

> "*** And what does he do? Remember what [C] said to you that was kind of an interesting thing? What did he say to Kenny? 'Check your bitch.'

> "Why would he say that? I want that necklace. Kenny, she's yours. I'm holding you responsible. You see that she gives me the necklace back. What's that person doing? *** A person aids or abets another person in the commission of a crime if the person, with the intent to promote or make easier the commission of the crime encourages, procures, advises, or assists, by act or advice, the planning or the commission of a crime.

> "'Check your bitch.' I want the necklace. Do what it takes to get it. *Even if he never touched her*, members of the jury, he has put in motion by advice, encouragement, the promotion or the commission of those crimes. What has he done? What does the aid and abet statute kind of do, folks? *It turns Kenny McKee into a weapon.*

> "Whose weapon? [Petitioner's]. He wants his wife's necklace back. ***

> "*****

"*** And you know, members of the jury, *it doesn't matter who hit her ***.* It doesn't matter who hit her because if [petitioner] was there and did what [C] said (inaudible) and [petitioner], I'll kill both of you if we don't get that necklace.

"*Kenneth McKee becomes his weapon.* [Petitioner] can sit back and say to you through his attorney well, I was pristine the next day. I didn't have any blood on my hands, I didn't have any broken knuckles, I didn't have any disheveled clothing. I was clear as the driven snow. I was there. I was sort of around. I had nothing to do with what happened.

"But you know what he did? It's like siccing your dog on the mailman. I didn't do anything, it was the dog. *** *Well, the fact that I said sic him, that's nothing.* ***

"Kenneth McKee, *even if you believe that the* [*petitioner*] *did not at any moment touch* [*C*]*, was* [*petitioner's*] *weapon and everything that happened, even if Kenneth McKee fired the shot, *** if he is being aided, abetted, encouraged, if he is the weapon of* [*petitioner*]*, it's as if* [*petitioner*] *had done it.*

"And it's in the instructions the judge read it to you earlier. Look at it very quickly. *** A person who aids or abets another in committing a crime, in addition to being criminally responsible for the crime that is committed—read that again—*in addition to being criminally responsible for the crime that is committed is also responsible for any acts and other crimes that are the natural and probable consequences of the planning, preparation or commission of the intended crime.*

"*** Well, it's the law, members of the jury. *** *If you put criminal activity into motion, then you want it to be into motion.*

"*What happens after that is your responsibility. Even if you say I didn't mean for that to happen, I didn't mean for him to shoot at her, I didn't mean for him to break her finger, I didn't mean for him to strangle her until she passed out.* All I wanted was my darn necklace back and that guy just went off on his own. He's an independent contractor. I was in the room but I had no control. The guy was just a maniac. He just totally took over."

(Emphases added.)

The prosecutor also stated that C was "an untrustworthy person" who "had problems." And, as to the attempted

murder charge, Count 1, the prosecutor reiterated that "it doesn't matter if" petitioner pulled the trigger, because he is an "aider and abettor" if Kenny pulled the trigger.

During petitioner's closing argument, he principally argued that C's testimony was not credible and that she fabricated petitioner's involvement in an effort to protect Kenny.[4]

In the prosecutor's rebuttal, he again likened Kenny to a "weapon":

> "Members of the jury, [petitioner] was there, he did it. If he didn't do it he had his weapon do it and his weapon was Kenneth McKee."

The prosecutor also addressed the felon in possession of a firearm charge, Count 11, in his rebuttal, explaining to the jury that "[p]ossession can be single or actual possession, constructive possession or joint possession. All [petitioner] has to do is hold the gun and he's in possession of it." He further argued:

> "We don't have to prove he had [the gun] for five minutes, ten minutes, five hours, 12 days. We don't have to prove other than that he possessed it. * * * [S]he said he had it in his hand. That's what she saw. You would think that maybe somebody about to be shot or thought they were about to be shot would recognize the person who did it, but maybe not.
>
> "Maybe she's confused. Maybe it was just Kenneth. Doesn't make much sense but maybe it was."

The prosecutor referred to exhibits demonstrating that petitioner, at the time of his conduct on December 7, 2017, had been convicted of felonies:

> "I do want to point out some exhibits * * *. * * * This goes to the possession of a weapon charge. This is just a stack of certified copies of convictions of [petitioner]. We need to put

---

[4] Petitioner also argued reasonable doubt existed as to the charges against him because the prosecutor did not "close the door" on the possibility that Kenny had a gun and intimidated petitioner out of the trailer, and that petitioner had "absolutely no involvement" in anything that happened in the trailer. Given the jury's guilty verdicts, we understand the jury to have rejected those theories.

these into evidence to prove that he was a felon at the time he possessed the weapon.

"If you choose to find that he possessed a weapon then these are critical to that, to making that other element proved. *** We have to prove a felony conviction. This is how we do it. *** That's what these are about."

The jury returned a verdict of not guilty on the attempted murder charge (Count 1) and guilty verdicts on the remaining charges against petitioner, checking "yes" under the question, "Did Defendant use, or threaten to use, a firearm?," on the verdict form for first-degree kidnapping (Count 2), second-degree assault (Count 3), third-degree assault (Count 4), and the two counts of coercion (Counts 7 and 8). The trial court then entered a judgment of conviction.[5]

Petitioner appealed but did not assign error to the trial court giving the "natural-and-probable-consequence" jury instruction. We affirmed without opinion petitioner's direct appeal, and the Supreme Court denied review. *State v. McMillan*, 249 Or App 334, 278 P3d 141, *rev den*, 352 Or 342 (2012).

E.  *The Post-Conviction Proceeding*

Petitioner sought post-conviction relief, alleging, among other claims, that (1) his trial counsel was ineffective and inadequate for failing to object to the natural-and-probable-consequence instruction, (2) his trial counsel was inadequate and ineffective for failing to object to the prosecutor's closing argument, which misstated Oregon law with regard to accomplice liability, and (3) his appellate counsel was inadequate and ineffective during petitioner's direct appeal for failing to "raise the issue regarding" the natural-and-probable-consequence jury instruction.

The post-conviction court denied petitioner's claim for relief, concluding:

"In 2009, the natural and probable consequences was good law. The instruction was proper then and there is

---

[5] In the judgment of conviction, the trial court merged fourth-degree assault (Count 5) with third-degree assault (Count 4), and merged the two counts of coercion (Counts 7 and 8).

insufficient proof that it in any way was prejudicial. The [petitioner] was the primary actor in most of the charges. He commanded [Kenny] McKee to also beat the [victim]. [Petitioner] was present for all acts charged.

"* * * * *

"This court has considered all of the claims and makes all of its findings on the merits, not on procedure.

"This court finds no inadequacy and no prejudice."

Petitioner now appeals the judgment of the post-conviction court denying his claims for post-conviction relief.

## II.   ANALYSIS

"We generally review a post-conviction court's grant or denial of relief for legal error, accepting the court's implicit and explicit factual findings if there is evidence to support them." *Edwards v. Taylor*, 295 Or App 476, 484, 434 P3d 451 (2018), *rev den*, 365 Or 533 (2019). At issue in this appeal, are parallel claims of inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, and ineffective assistance of counsel under the Sixth Amendment to the United States Constitution.

### A.   *Petitioner's First and Second Assignments of Error*

We first consider petitioner's first and second assignments of error. As noted above, in his first assignment of error, petitioner contends that his trial counsel was inadequate and ineffective for failing to object to the natural-and-probable-consequence instruction and, in his second assignment of error, he argues that his trial counsel was inadequate and ineffective for failing to object to the prosecutor's closing argument that misstated Oregon law as to accomplice liability. Because the prosecutor's closing argument regarding accomplice liability included, among other points, explicit reference to the natural-and-probable-consequence jury instruction that was given by the trial court, as well as argument premised on that instruction, in resolving petitioner's first and second assignments of error, we largely focus on that instruction, which, as noted above, the Supreme Court declared to be a misstatement of Oregon law in *Lopez-Minjarez*, 350 Or at 582.

To establish that his trial counsel rendered inadequate assistance for purposes of Article I, section 11, "petitioner was required to prove two elements: (1) a performance element—that trial counsel 'failed to exercise reasonable professional skill and judgment'; and (2) a prejudice element—that 'petitioner suffered prejudice as a result of counsel's inadequacy.'" *Edwards*, 295 Or App at 484 (quoting *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017)). With respect to the prejudice element, in *Green v. Franke*, 357 Or 301, 350 P3d 188 (2015), the Supreme Court explained that where the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue—as is the case here—the question is "whether trial counsel's acts or omissions could have tended to affect the outcome of the case." *Id.* at 322-23 (internal quotation marks and emphasis omitted).

"A functionally equivalent two-element standard governs petitioner's claim of ineffective assistance of counsel under the Sixth Amendment." *Edwards*, 295 Or App at 484. To prevail on that claim, "petitioner was required to demonstrate that trial counsel's performance fell below an objective standard of reasonableness, and also that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 484-85 (internal quotation marks omitted).

As neither party argues that, with respect to the claims at issue in this case, the state and federal constitutions require separate analyses, our analysis applies to petitioner's claims under both constitutions. *See id.* at 485.

We now turn to the "performance element" of petitioner's claims regarding his trial counsel's representation.

Petitioner's contention concerning the performance element of his claims regarding his trial counsel's representation is well taken. As indicated above, in *Lopez–Minjarez*, the Supreme Court concluded that that the natural-and-probable-consequence instruction—which was given to the jury during petitioner's trial—"incorrectly states the principles of accomplice liability under Oregon law." 350 Or at 582. In its analysis, the court compared the natural-and-probable-consequence instruction to the statute creating

accomplice liability under Oregon law, ORS 161.155, and concluded that the instruction misstated the law.[6] 350 Or at 583. The court explained that ORS 161.155(2) requires a *specific intent*: the intent to "promote or facilitate the commission of the crime committed by another." *Id.* at 582. In contrast, under the natural-and-probable-consequence instruction, in addition to being responsible for the intended crime, a person

> "*also* is criminally responsible for 'any act or other crime' that was the 'natural and probable consequence' of the intended crime. In effect, the instruction tells a jury that, once it finds liability based on an aiding and abetting theory, it can find a defendant guilty of any *other* crimes that the jury finds to be the natural and probable consequence of the crime for which there was accomplice liability. That criminal responsibility attaches under the instruction for any naturally consequential crime, without regard to whether the defendant acted with the intent that ORS 161.155 requires.

> "Put simply, Oregon law does not give rise to criminal liability on such a theory. Accomplice liability is both created by and limited by ORS 161.155."

*Id.* at 583 (emphases added).

Following the court's decision in *Lopez-Minjarez*, we have concluded, in various cases, that trial counsel's failure to object to the natural-and-probable-consequence instruction constituted deficient performance. *See, e.g.*, *Walraven v. Premo*, 277 Or App 264, 279-85, 372 P3d 1 (2016); *Wade v. Brockamp*, 268 Or App 373, 380-88, 342 P3d 142 (2015). In

---

[6] ORS 161.155 provides:

"A person is criminally liable for the conduct of another person constituting a crime if:

"(1) The person is made criminally liable by the statute defining the crime; or

"(2) With the intent to promote or facilitate the commission of the crime the person:

"(a) Solicits or commands such other person to commit the crime; or

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime; or

"(c) Having a legal duty to prevent the commission of the crime, fails to make an effort the person is legally required to make."

this case, the superintendent concedes that, "under *Wade*," petitioner's trial counsel's performance was deficient.[7] We agree with and accept that concession.

We next turn to the "prejudice element" of petitioner's claims regarding his trial counsel's representation.[8]

In evaluating prejudice in this case, our decision in *Wade* is instructive. In that case, evidence at the petitioner's criminal trial reflected that the petitioner telephonically called the victim, a man who had previously sold the petitioner drugs, asking if he wanted to "party," and arranged to meet the victim at a motel room that the victim had rented. 268 Or App at 375. Subsequently, the petitioner, her boyfriend, and two unidentified women, went to the motel room. *Id.* at 376. After the victim let them in, one of the unidentified women threw a hammer-like object to the petitioner's boyfriend, who hit the victim with it, knocking him unconscious. *Id.* When the victim regained consciousness, he saw that his phone, wallet, and vehicle were missing. *Id.*

The petitioner and her boyfriend were both charged with two counts of first-degree robbery, ORS 164.415 (robbery involving the use of a dangerous weapon and robbery involving infliction of serious injury), two counts of second-degree robbery, ORS 164.405 (robbery based on representation that a person is armed with a dangerous weapon and robbery aided by another person present), and one count of first-degree assault, ORS 163.185 (causing serious injury with a dangerous weapon). *Id.* The prosecutor's theory was that the petitioner's boyfriend was directly responsible for the charged offenses and that petitioner was liable on an aid-and-abet theory because she set the victim up for the robbery and assault. *Id.*

---

[7] In his briefing, the superintendent takes the position that "*Wade* was wrongly decided" in order to "preserve the matter for potential review in the Oregon Supreme Court."

[8] In the superintendent's briefing, the superintendent conceded that petitioner's trial counsel's deficient performance caused petitioner prejudice with respect to fourth-degree assault (Count 5), strangulation (Count 6), and menacing (Count 9). At oral argument, the superintendent stated that it had also conceded recklessly endangering another person (Count 10), and withdrew its concession as to fourth-degree assault (Count 5). For the reasons described in this opinion, we agree with and accept the superintendent's concessions with respect to Counts 6, 9, and 10.

During his closing argument, the prosecutor argued to the jury that he did not have to prove beyond a reasonable doubt that the petitioner had the robbery and assault "planned" in order for the jury to convict the petitioner of robbery and assault as an accomplice, and told the jury that it may have been that the petitioner merely wanted to steal money from the victim or use methamphetamine. *Id.* at 376-77. The jury was given the natural-and-probable-consequence instruction and convicted petitioner of the charged crimes. *Id.* at 377.

The petitioner sought post-conviction relief, which the post-conviction court granted, determining that the petitioner's trial counsel provided her with constitutionally deficient legal representation by failing to object to the natural-and-probable-consequence instruction. *Id.* at 375. On appeal, we affirmed. *Id.*

As relevant here, with respect to prejudice, we concluded that the failure of the petitioner's trial counsel to object to the natural-and-probable-consequence instruction "had a tendency to affect the result" of her trial and, therefore, prejudiced the petitioner under Article I, section 11. *Id.* at 389. We explained:

"The instruction went directly to the state's theory of petitioner's liability for the assault and robbery. The state in its closing argument suggested that petitioner may have merely wanted to steal from the victim, or even only wanted to use methamphetamine, implying that the jury did not have to find that petitioner had the intent, required by the statutory requirement for accomplice liability, ORS 161.155(2), to assault the victim with a weapon or to rob him by employing a deadly weapon or causing serious injury. That argument—that petitioner may not have had robbery and assault in mind when she contacted the victim—suggested to the jury that petitioner's intention that night did not have to include the intent of having [her boyfriend] assault the victim *** with a hammer-like object to relieve him of his money and car.

"Similarly, the natural and probable consequence instruction permitted the jury to find petitioner guilty of robbery and assault even if the jury concluded that she had only the intent to facilitate a theft of the victim's money

or car. \*\*\* [T]he jury could have concluded that petitioner had intended to set up the victim for theft and then found her also to be guilty of robbery and assault because those crimes were the natural and probable consequence of that intention. In light of that discrepancy between what was required of the jury and what they were actually asked to consider, we conclude that the natural and probable consequence instruction would have had a tendency to affect the result of the prosecution."

*Id.* at 389-90 (internal quotation marks omitted).

After we decided *Wade*, in *Drown v. Persson*, 294 Or App 754, 432 P3d 1144 (2018), *rev den*, 364 Or 723 (2019), and *Edwards*, we explained the "general framework" for evaluating whether a post-conviction petitioner was prejudiced by his or her trial counsel's failure to object to delivery of the natural-and-probable-consequence instruction. *Edwards*, 295 Or App at 486 (discussing the analysis undertaken in *Drown*). We observed that "the risk of harm created by the natural-and-probable-consequence instruction is that it permits a jury to convict a defendant for a crime without requiring the jury to find that the defendant had the requisite criminal intent with respect to that crime." *Id.* In general, "for that risk of harm to have materialized with respect to one or more convictions, there must be some likelihood that the jury could have found the defendant guilty of a prior offense under an ordinary aiding-and-abetting theory." *Id.* Thus, as a general matter, to determine whether a post-conviction petitioner was prejudiced by the delivery of the natural-and-probable-consequence instruction,

> "'we must determine whether, in light of the parties' evidence and arguments, the jury's guilty verdict on one or more of the charges could have been based on the theory of criminal responsibility contained in the erroneous instruction. Stated differently, for each charged crime, we must determine whether the jury could have found the defendant guilty of the crime on the theory that the crime was a natural and probable consequence of an earlier crime in which the defendant had aided or abetted. That inquiry requires that we first identify in time the initial, intended crime for which the jury could have found the defendant guilty based on an ordinary accomplice theory. That is because to trigger criminal responsibility under the erroneous

instruction, the jury first had to find defendant guilty of at least one predicate crime on an accomplice (*i.e.*, aiding and abetting) theory.'"

*Id.* at 486-87 (quoting *Drown*, 294 Or App at 760). Under that analysis, "we must identify the first-in-time convictions, if any, on which the jury could have found petitioner guilty as an ordinary accomplice." *Id.* at 487.

In *Edwards*, we also observed that the prejudice analysis that we undertook in *Wade* "did not follow the same path" as the analysis we undertook in *Drown* and *Edwards*, because the prosecutor in *Wade* "argued to the jury that it could convict the petitioner without finding that she intended to assist in the charged robbery and assault but, instead, could do so even if it found that she only had intended to facilitate an uncharged offense such as theft." *Edwards*, 295 Or App at 489. That is, in analyzing prejudice in *Wade*, we considered the "specific way that the prosecutor presented th[e] case to the jury—which, in essence, invited the jury to convict the petitioner on the basis that the charged offenses were the natural-and-probable consequence of the petitioner's decision to aid and abet an uncharged theft"—and "concluded that the instruction was prejudicial." *Edwards*, 295 Or App at 489-90.

In this case, analyzing the prejudice element of petitioner's claims regarding his trial counsel's representation using the analytical framework that we described in *Edwards* and *Drown*—which requires us to identify the "the first-in-time convictions, if any, on which the jury could have found petitioner guilty as an ordinary accomplice," *Edwards*, 295 Or App at 487—presents some difficulty because, as noted above, during petitioner's criminal trial, the prosecutor did not concretely tie many of the crimes with which petitioner was charged to specific conduct undertaken by petitioner or Kenny. That is, in arguing the case to the jury, the prosecutor chose not to "go into each individual count," but instead spoke about the conduct of petitioner and Kenny "in general." The prosecutor went so far as to tell the jury that a chronology would be hard to establish, because "you don't always know exactly what order things happen because

sometimes things happen simultaneously or sometimes people get confused about the way things happen."

Nevertheless, guided by our analysis in *Wade* and *Edwards*, and considering the specific way that the prosecutor in this case presented the case to the jury, we conclude that, for many of the counts against petitioner, there was a "discrepancy between what was required of the jury and what they were actually asked to consider," and therefore, "conclude that the natural and probable consequence instruction," coupled with the prosecutor's closing argument, could "have had a tendency to affect the result of the prosecution" with respect to those counts. *Wade*, 268 Or App at 389-90 (internal quotation marks omitted).

In this case, as described above, during his closing argument, the prosecutor expressly relied on the natural-and-probable-consequence instruction, which was given by the trial court, when presenting the prosecutor's "alternate" theory of criminal responsibility to the jury. The prosecutor argued that the jury could convict petitioner of the charges against him even if the jury believed that petitioner "never touched" C, that Kenny was the person who fired the gun at C, and that petitioner "didn't mean for [aspects of Kenny's conduct] to happen," as long as petitioner put criminal activity into motion by saying "check your bitch."

The prosecutor's closing argument, in conjunction with the natural-and-probable-consequence instruction, which given by the trial court, in essence, informed the jury that it could convict petitioner of the assault charges (Count 3, Count 4, Count 5, which were premised on C being hit with the gun and the beating of C), the strangulation charge (Count 6, which was premised on Kenny strangling C), and the recklessly endangering another person charge (Count 10, which was premised on the gun being fired at C), if it found that Kenny committed those crimes, without finding petitioner had the "specific intent" to "promote or facilitate the commission" of those crimes by Kenny, as required by ORS 161.155(2)(b). *Lopez-Minjarez*, 350 Or at 582.

For example, given the prosecutor's closing argument and the erroneous natural-and-probable-consequence instruction, which was given by the trial court, the jury

could have determined that petitioner intended to aid Kenny in the commission of the crime of coercion—*i.e.*, intended to aid Kenny in instilling in C a fear that, if C refrained from returning the necklace to petitioner, either petitioner or Kenny would unlawfully cause physical injury to C—and then found petitioner to also to be guilty of Kenny's conduct of assault (Counts 3 to 5), strangulation (Count 6), and recklessly endangering another person (Count 10), because those crimes were the natural-and-probable consequence of the aided coercion.[9] Accordingly, with regard to Counts 3 to 6, and Count 10, in light of the discrepancy between what was required of the jury (determining whether petitioner had a *specific intent* to "promote or facilitate" the commission of the crimes, *Lopez-Minjarez*, 350 Or at 582), and what they were actually asked to consider (whether any crime was a "natural and probable consequence of the crime for which there was accomplice liability," *id.* at 583), we conclude that petitioner's trial counsel's failure to object to the natural-and-probable-consequence instruction, which was given by the trial court, and failure to object to the prosecutor's closing argument, which misstated accomplice liability, could have had a tendency to affect the verdict. That is, we conclude, for Counts 3 to 6 and Count 10, petitioner's trial counsel's deficient representation prejudiced petitioner.

We next turn to the coercion charges (Counts 7 and 8), the menacing charge (Count 9), and the unlawful use of a weapon charge (Count 12). During his closing argument, the prosecutor never clearly articulated what particular conduct he was relying on to support a conviction on those charges,

---

[9] ORS 163.275 provides, in relevant part:

"(1) A person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain, or to abstain from engaging in conduct in which the other person has a legal right to engage, by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced or engages in conduct contrary to the compulsion or inducement, the actor or another will:

"(a) Unlawfully cause physical injury to some person[.]"

ORS 163.275 has been amended twice since 2007 when the conduct at issue in this case took place. Or Laws 2007, ch 71, § 45; Or Laws 2015, ch 751, § 1. We cite the current version of ORS 163.275 in this opinion because those amendments do not affect our analysis.

and, importantly, never articulated whether that conduct was undertaken by petitioner, acting as a principal, or by Kenny, with petitioner aiding and abetting those crimes.[10] Instead, as noted above, the prosecutor took the position that, "if the [petitioner] is in for any one of [the crimes], he's in for all of them, because they all happened as a package." Further, the prosecutor adduced evidence, via C's testimony, that would have allowed the jury to determine that Kenny was guilty of coercion (Counts 7 and 8), menacing (Count 9), and unlawful use of a weapon (Count 12), and that those crimes were a natural-and-probable consequence of earlier criminal conduct engaged in by Kenny, in which Kenny was aided by petitioner.

For example, the jury could have found that petitioner intended to aid Kenny in the crime of unlawful use of a weapon by bringing the gun to Kenny. Once the jury made such a finding, it could have also found that Kenny engaging in conduct constituting coercion and menacing using the gun was a natural-and-probable consequence of the aided crime of unlawful use of a weapon. Alternatively, the jury could have found petitioner intended to aid Kenny in the crime of menacing, and Kenny engaging in conduct constituting coercion and unlawful use of a weapon was the natural-and-probable consequence of the aided crime of menacing.

---

[10] We note that Count 7 of the amended indictment alleges petitioner committed coercion by

"unlawfully and knowingly compel[ling] another person to abstain from engaging in conduct in which the other person had a legal right to engage, to wit: leave a location on Schaffer Road, by means of instilling in the other person a fear that if that other person engaged in the conduct contrary to said compulsion defendant or another person would unlawfully cause physical injury to that other person."

Count 8 of the amended indictment alleges petitioner committed coercion by

"unlawfully and knowingly compel[ling] another person to engage in conduct from which the other person had a legal right to abstain, to wit: give property to another person, by means of instilling in the other person a fear that if that other person refrained from the conduct compelled defendant or another person would unlawfully cause physical injury to that other person."

Those allegations indicate what conduct the state believed that petitioner or Kenny coerced—*i.e.*, C not leaving the trailer on Schaffer Road and C returning the necklace. They do not indicate, however, what specific conduct by Kenny or petitioner the state was relying on to prove those crimes.

Accordingly, for Counts 7 to 9 and Count 12, there is "some likelihood" that the jury's verdicts "could have turned on the erroneous natural-and-probable-consequence instruction," *Edwards*, 295 Or App at 488, particularly when the instruction is coupled with the prosecutor's closing argument and the prosecutor's failure to clearly articulate a theory of criminal responsibility with respect to those crimes. Consequently, we conclude petitioner's trial counsel's constitutionally deficient performance prejudiced petitioner with respect to Counts 7 to 9 and Count 12.

We next turn to the first-degree kidnapping charge (Count 2). For that count, the prosecutor articulated a theory for first-degree kidnapping during his closing argument—*viz.*, that "the kidnapping started first," and C's "personal liberty was taken from her" when she was being beaten. As argued by the prosecutor, once C was "not free to go"—*i.e.*, when she was being beaten—and when "the person who is confining her has the intent to hurt her and her liberty is substantially impaired, that's a kidnap." As noted above, the prosecutor also invited the jury to find petitioner guilty even if petitioner "never touched" C—that is, even if Kenny, not petitioner, assaulted C—because if "you put criminal activity into motion, then you want it to be into motion," and "[w]hat happens after that is your responsibility[, e]ven if you say I didn't mean for that to happen."

The theory of first-degree kidnapping advanced by the prosecutor during petitioner's criminal trial thus included assaultive conduct that the prosecutor told the jury it could ascribe to Kenny. And the natural-and-probable-consequence instruction given by the trial court would have permitted the jury to convict petitioner of kidnapping even if it found that petitioner only intended to aid Kenny in a different crime, such as coercion, and Kenny, subsequently, as a natural-and-probable consequence of that aided crime, committed the crime of first-degree kidnapping. Because there is "some likelihood" that the jury's verdict with respect to first-degree kidnapping "could have turned on the erroneous natural-and-probable-consequence instruction" given by the trial court, *Edwards*, 295 Or App at 488, at least when coupled with the theory of criminal responsibility for that crime articulated during the prosecutor's closing argument,

we conclude that petitioner's trial counsel's deficient performance caused him prejudice with respect to Count 2.[11]

In contrast, we conclude that trial counsel's failure to object to the natural-and-probable-consequence instruction and failure to object to the prosecutor's closing argument regarding accomplice liability did not cause petitioner prejudice regarding the felon in possession of a firearm charge (Count 11) or the first-degree burglary charge (Count 13). With regard to those crimes, the prosecutor's theory of petitioner's criminal responsibility, coupled with the evidence presented at trial, required the jury to find that petitioner committed those crimes as a principal in order to convict him. Because the jury convicted petitioner as a principal, petitioner was not prejudiced by his trial counsel's failure to object to the natural-and-probable-consequence instruction or failure to object to the prosecutor's closing argument regarding accomplice liability. *See Lopez-Minjarez*, 350 Or at 587 (giving of natural-and-probable-consequence instruction "patently harmless" as to kidnapping conviction, where the "best evidence" for the defendant established the defendant's "criminal liability for kidnapping in the first degree, based either on an accomplice or principal theory"); *Drown*, 294 Or App at 760 (concluding the petitioner suffered no prejudice where "there was no theory by which the jury could have found her guilty of a crime that was a natural and probable consequence of an earlier, intended crime that petitioner had aided or abetted [another person] in committing").

We first turn to the felon in possession of a firearm charge (Count 11). The prosecutor's theory at trial was that petitioner was a principal for that crime: The prosecutor

---

[11] During oral argument on appeal, the superintendent acknowledged that "[t]he prosecutor wasn't totally clear on the [theory of] kidnapping" during petitioner's trial. In the superintendent's view, there were two competing theories of kidnapping: "one at the beginning"—presumably, a reference to the prosecutor's statement during closing argument that C's "personal liberty was taken from her" when she was being beaten and "not free to go"—and one at "the end." The one at the end, as articulated the superintendent at oral argument, was based on C being told to "stay inside of the trailer until her wounds healed" and being told to do so "with the threat of a firearm." Because we conclude that petitioner was prejudiced based on the theory of kidnapping articulated by the prosecutor during his closing argument—*i.e.*, the "at the beginning" theory—we do not consider the alternative theory of first-degree kidnapping raised by the superintendent at oral argument in our analysis.

introduced evidence of petitioner's prior felony convictions. He then argued to the jury that, if the jury found that petitioner possessed a firearm—either singly, jointly, personally, or constructively—evidence of petitioner's prior convictions was relevant to establish that petitioner was guilty of the crime of felon in possession of a firearm. In contrast, the prosecutor did not present evidence that, on December 7, 2007, Kenny had previously been convicted of a felony or that petitioner had any knowledge that Kenny was a felon, and the prosecutor did not assert during closing argument that Kenny was a felon on December 7, 2007. In light of the evidence presented, and the argument made to the jury, we conclude that petitioner did not suffer prejudice with regard to the felon in possession of a firearm charge, because the jury could not have found petitioner guilty of that crime based on a "theory of criminal responsibility contained in the erroneous [natural-and-probable-consequence] instruction," *Edwards*, 295 Or App at 486 (internal quotation marks omitted), or based on the prosecutor's closing argument regarding accomplice liability.

Similarly, for the first-degree burglary charge (Count 13), the prosecutor's theory at trial was that petitioner was a principal with respect to that crime. As noted above, the prosecutor argued during his closing argument that petitioner's entry was "probably lawful," but that petitioner converted that lawful entry into unlawful remaining by remaining in the trailer when C was being beaten, and that petitioner stayed "there long enough to participate in [C's] physical injury." At no point did the prosecutor argue that Kenny committed burglary. Nor, seemingly, would such an argument have been cognizable, as all parties agreed, and the evidence reflected, that, on the morning of December 7, 2007, the trailer was Kenny's residence.[12] In light of the evidence presented, and the argument made to the jury, we conclude that petitioner did not suffer prejudice

---

[12] As noted above, evidence at petitioner's criminal trial indicated the trailer had been stolen by Kenny. During petitioner's criminal trial, neither party suggested the fact that the trailer was stolen by Kenny should play a role in the jury's analysis of whether petitioner entered or remained in the trailer unlawfully, and on appeal, neither party suggests the fact that the trailer was stolen by Kenny should play a role in our analysis of whether petitioner's trial counsel's constitutionally deficient performance caused him prejudice.

as to the first-degree burglary charge, because the jury could not have found petitioner guilty of that crime based on a "theory of criminal responsibility contained in the erroneous [natural-and-probable-consequence] instruction," *Edwards*, 295 Or App at 486 (internal quotation marks omitted), or based on the prosecutor's closing argument regarding accomplice liability.

Having considered all of the charges for which the jury found petitioner guilty, we pause to note, and reject, an argument made by the superintendent on appeal regarding prejudice. As noted above, on the verdict form, for first-degree kidnapping (Count 2), second-degree assault (Count 3), third-degree assault (Count 4), and the two counts of coercion (Counts 7 and 8), the jury checked "yes" under the question "Did Defendant use, or threaten to use, a firearm?" In the superintendent's view, the jury's finding on that point "demonstrated that it found that petitioner *personally used* a firearm in committing an offense as a principal, not an accomplice." (Emphasis in the superintendent's brief.) In support of that argument, the superintendent relies on *State v. Pies*, 104 Or App 646, 650, 802 P2d 702 (1990), in which we observed that "a minimum sentence under ORS 161.610 cannot be imposed without a finding that the defendant personally used, or threatened to use, a firearm," and that a "sufficient finding is made when the factfinder returns a verdict of guilty on a charge in which one of the elements is the 'use or threatened use of a firearm' or when the factfinder makes a separate finding on that issue."[13] We also observed in *Pies*, however, that, "in either case, the finding must establish that the defendant personally used or threatened to use a firearm." *Id.* at 650-51.

Here, we cannot say that the jury's finding that petitioner "use[d], or threaten[ed] to use" a firearm constitutes a finding that petitioner acted as a principal in the charged

---

[13] ORS 161.610 provides that the "use or threatened use of a firearm *** by a defendant during the commission of a felony may be pleaded in the accusatory instrument and proved at trial as an element in aggravation of the crime."

ORS 161.610 has been amended twice since 2007 when the conduct at issue in this case took place. Or Laws 2009, ch 610, § 5; Or Laws 2019, ch 634, § 7. We cite the current version of ORS 161.610 in this opinion because those amendments do not affect our analysis.

crimes, and personally used or threatened to use a firearm in the commission of first-degree kidnapping (Count 2), second-degree assault (Count 3), third-degree assault (Count 4), and the two counts of coercion (Counts 7 and Count 8), as the superintendent contends. The jury was never instructed that to check "yes" on the verdict form on the line under the text reading, "Did Defendant use, or threaten to use, a firearm?," it had to find that petitioner committed the crimes as a principal, not as an accomplice, and was never instructed that to check the "yes" on that line it must find that petitioner personally used or threatened to use a firearm. To the contrary, the prosecutor argued that if petitioner acted as Kenny's accomplice in a crime it was "as if" petitioner had done it himself. The prosecutor also argued that the jury could convict petitioner of second-degree assault—a crime that contained the firearm enhancement language—even if it found that petitioner "never touched" C. And, neither party ever suggested to the jury that the firearm enhancement language was inapplicable if it found petitioner "never touched" C, but merely acted as an accomplice to an assault by Kenny in which Kenny used or threatened the use of a firearm. Accordingly, given the argument made to the jury and the instructions given to the jury, we reject the superintendent's argument.

B.   *Petitioner's Third Assignment of Error*

We turn to petitioner's third assignment of error, in which he contends that the post-conviction court erred when it denied petitioner relief on his claim that appellate counsel was inadequate and ineffective during petitioner's direct appeal for failing to assign plain error to the trial court giving the natural-and-probable-consequence jury instruction, which misstated Oregon law with regard to accomplice liability. As explained in our analysis of petitioner's first two assignments of error, we conclude that petitioner's trial counsel's performance fell below constitutional standards when his trial counsel failed to object to the natural-and-probable-consequence jury instruction, which incorrectly stated Oregon law with regard to accomplice liability, and failed to object to the prosecutor's closing argument, which misstated Oregon law with regard to accomplice liability.

Further, as explained in our analysis of petitioner's first two assignments of error, we conclude that, for 10 of the 12 crimes for which the jury found petitioner guilty, petitioner suffered prejudice due to his trial counsel's deficient performance.

As to the two crimes for which the jury found petitioner guilty and we conclude that petitioner's trial counsel's deficient performance did not cause petitioner prejudice—felon in possession of a firearm (Count 11) and first-degree burglary (Count 13)—petitioner has not undertaken to explain how our prejudice inquiry would differ if his appellate counsel's performance was also deficient. Accordingly, even if we were to conclude that petitioner's appellate counsel's performance fell below constitutional standards, we have no basis to conclude that that deficient performance caused petitioner to suffer prejudice as to Counts 11 and 13. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's proper function to *** develop a party's argument when that party has not endeavored to do so itself.").

## III.  CONCLUSION

In sum, we conclude that petitioner's trial counsel's performance was constitutionally deficient, and that that constitutionally deficient performance caused petitioner prejudice with respect to Counts 2 to 10 and Count 12.

Reversed and remanded with instructions for the post-conviction court to grant petitioner relief on Counts 2 to 10 and Count 12; otherwise affirmed.